Ashley LYNCH, Plaintiff–Appellant,

v.

SHELTER MUTUAL INSURANCE COMPANY, Defendant–Respondent.

No. SD 30270.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 7, 2010.

Motion for Rehearing and Transfer
Denied Oct. 27, 2010.

Application for Transfer Denied
Dec. 21, 2010.

Jason M. Pottenger, Hans H. van Zanten, and Thomas R. Onik, Yonke & Pottenger, L.L.C., Kansas City, MO, for Appellant.

Angela K. Drake and Kory D. Stubblefield, Lowther Johnson, Attorneys at Law, L.L.C., Springfield, MO, for Respondent.

GARY W. LYNCH, Judge.

Ashley Lynch sued Shelter Mutual Insurance Company ("Shelter") seeking $200,000.00 in underinsured motorist benefits under the terms of four Shelter insurance policies for injuries that resulted from a motor vehicle collision. The trial court entered summary judgment in favor of Shelter, holding that, due to the unambiguous set-off clause and anti-stacking language in the Underinsured Motorist ("UIM") Endorsement to each policy, Shelter did not owe any money to Lynch. On appeal, Lynch contends that the set-off and anti-stacking provisions are ambiguous and should be construed in favor of coverage. Finding no ambiguities as alleged by Lynch, we affirm the trial court's judgment.

### *Factual and Procedural Background*

On July 1, 2006, Lynch was a passenger in Michael Glavin's vehicle when Glavin lost control of the vehicle, causing it to strike a guard rail. As a result of the accident, Lynch sustained various and severe injuries, including a right pelvis fracture, a skull fracture, a fracture to the sacroiliac joint, and a herniated disk. The parties stipulate that Lynch suffered in excess of $300,000.00 in damages as a result of the accident.

Glavin's insurer at the time, SAFECO Insurance Company of America ("SAFECO"), provided a policy with liability limits of $100,000.00 per person and $300,000.00 per occurrence. SAFECO paid the policy limit of $100,000.00 to Lynch in settlement of any and all claims she might have against Glavin.

At the time of the accident, Lynch was an insured under four separate policies issued by Shelter, each covering a different vehicle. All four policies were in full force and effect at the time of the collision. Each included a declared limit of liability for underinsured motorist coverage in the amount of $50,000.00 per person and $100,000.00 per occurrence.[1] Lynch filed a petition against Shelter in August 2008 seeking $200,000.00 in underinsured motorist coverage under the terms of the four Shelter policies. In claiming this amount, she asserted that the $50,000.00 declared limit of liability of each of the four policies should be "s tacked" together.

The relevant provisions of the UIM Endorsement, which is the same for each policy, are as follows:

ADDITIONAL DEFINITIONS USED IN THIS ENDORSEMENT As used in this Coverage E–1,

. . . .

(2) **Damages** means the full amount of compensation due for **bodily injury.**

(3) **Uncompensated damages** means the portion of the **damages** which exceeds the total amount paid or payable to an **insured** by, or on behalf of all **persons** legally obligated to pay those **damages.**

. . . .

INSURING AGREEMENT FOR COVERAGE E–1

If an **insured** sustains **bodily injury** as a result of an **accident** involving the **use** of a motor vehicle, and is entitled to **damages** from any **person** as a result of that **bodily injury,** we will pay the **uncompensated damages** subject to the limit of **our** liability stated in this endorsement.

---

1. The "Declarations" page for each policy provided, in pertinent part: "THE FOLLOWING ENDORSEMENTS ARE A PART OF THIS POLICY AND ARE ATTACHED: A–

577.1–A UNDERINSURED MOTORISTS $50,000 PER PERSON/ $100,000 PER ACCIDENT[.]"

. . . .

LIMIT OF **OUR** LIABILITY

The limit of liability for this Coverage will be the limit of liability stated for this particular endorsement number in the Declarations, subject to the following limitations:

. . . .

(2) The limit of liability stated in the Declarations will be reduced by all amounts paid or payable to the **insured** making the **claim** by, or on behalf of, all **persons** legally obligated to pay any portion of the **damages** to that **insured.**

. . . .

(5) Regardless of the number of:

(a) vehicles involved in the **accident,**

(b) **persons** insured,

(c) **claims** made, or

(d) premiums paid,

the limits for this Coverage may not be added to, combined with, or stacked onto the limits of other underinsured motorists coverage to determine the total limit of underinsured motorists coverage available to any **insured** for any one **accident.**

OTHER INSURANCE

If an **insured's claim** under this Coverage arises out of bodily injury sustained while **occupying** the **described auto,** no other policy of underinsured motorist insurance, issued by us will apply to such a claim. However, the insurance provided by this Coverage will apply as excess insurance over any other company's underinsured motorists insurance available to the **insured** as a result of the same **accident.** The insurance under this policy will then apply only if the total of the limits of all such other insurance is less than the limit of liability of this Coverage. In that instance, **we** will be liable, under this Coverage, for only that amount by which its limit of liability exceeds the total limits of all such other insurance.

Shelter filed a motion for summary judgment asserting that because Glavin's insurance company paid Lynch $100,000.00, the set-off provision of subsection (2) under the "Limit of Our Liability" section of the Endorsement reduced Lynch's recovery to zero, because the per-person declared liability limit of $50,000.00 must be reduced by the $100,000.00 paid by Glavin's insurer. Furthermore, Shelter argued that the anti-stacking language found in subsection (5) under that same section unambiguously prohibited stacking.

The trial court entered judgment in favor of Shelter on all of Lynch's claims. Lynch's timely appeal followed.

### *Standard of Review*

We review a trial court's grant of summary judgment *de novo* and view the record in the light most favorable to the party against whom judgment was entered. *Seeck v. Geico Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007); *American Std. Ins. Co. v. Hargrave,* 34 S.W.3d 88, 89 (Mo. banc 2000). Summary judgment is appropriate where there is no genuine issue as to material fact and the movant is entitled to judgment as a matter of law. *American Std. Ins. Co.,* 34 S.W.3d at 89.

"The interpretation of an insurance policy is a question of law that this [C]ourt determines *de novo.*" *Jones v. Mid–Century Ins. Co.,* 287 S.W.3d 687, 690 (Mo. banc 2009). "In construing the terms of an insurance policy, this Court applies 'the meaning which would be attached by an ordinary person of average understanding if purchasing insurance,' and resolves ambiguities in favor of the insured." *Id.* (quoting *Seeck,* 212 S.W.3d at 132; *Martin*

*v. United States Fid. & Guar. Co.*, 996 S.W.2d 506, 508 (Mo. banc 1999)).

### Discussion

The determinative issue on appeal is whether the UIM Endorsement provisions in Shelter's policy are ambiguous. On this issue, Lynch raises two points on appeal. We address them in the order presented.

### *No ambiguity in set-off provisions*

■ Lynch contends in her first point that, by using ambiguous set-off language in the UIM Endorsement, Shelter improperly set off the payments made by Glavin's insurance company from its declared liability limits and the trial court's judgment in favor of Shelter on this point was erroneous. Specifically, Lynch argues that

the definitions contained within the UIM Endorsement indicate [Lynch] was to be compensated for the full extent of the damages she sustained up to the stated policy limits after deducting any amounts paid by the tortfeasor from [Lynch's] total damages; and the Limit of Our Liability section purports to compensate [Lynch] up to the maximum limit of liability stated in the policy Declarations but uses set-off language to then take that coverage away.

■ Ambiguity exists "when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Jones*, 287 S.W.3d at 690 (quoting *Seeck*, 212 S.W.3d at 132). "Language is ambiguous if it is reasonably open to different constructions." *Id.* Furthermore, "if a contract promises something at one point and takes it away at another, there is an ambiguity." *Seeck*, 212 S.W.3d at 132. Policy language that is ambiguous will be construed against the insurer. *Id.* Disagreement between the parties regarding the interpretation of a term or clause in an insurance policy, however, does not create an ambiguity. *Windsor Ins. Co. v. Lucas*, 24 S.W.3d 151, 153 (Mo.App.2000) (citing *Lang v. Nationwide Mut. Fire Ins. Co.*, 970 S.W.2d 828, 830 (Mo.App.1998)). A court is not permitted to create an ambiguity or distort the language of an unambiguous policy in order to enforce a particular construction that it deems more appropriate. *Rodriguez v. Gen. Accident Ins. Co.*, 808 S.W.2d 379, 382 (Mo. banc 1991). Absent any ambiguity, an insurance policy will be enforced according to its terms. *Id.* Finally, it is well established that "[c]ourts should not interpret policy provisions in isolation but rather evaluate policies as a whole." *Ritchie v. Allied Property & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009).

Focusing on the definition of "uncompensated damages," the premise of Lynch's ambiguity argument in this point is that "[t]he definitions within the Endorsement dictates [sic] that [Lynch] would be compensated for 'the portion of the damages which exceeds the total amount paid or payable' to [Lynch] by the negligent tortfeasor—Michael Glavin." Relying upon the language in *Seeck*, 212 S.W.3d at 132, she then reasons from this premise that the set-off language in subsection 2 of the limitation of liability section takes away this promised compensation, thereby creating an ambiguity. The flaw in this argument is that the premise is faulty. While the definition of "uncompensated damages" describes a formula for ascertaining the existence and amount of such damages, it contains no promise of compensation. Such a promise must be found elsewhere in the policy.

According to the "INSURING AGREEMENT FOR COVERAGE E–1," Shelter agreed to pay Lynch her **"uncompensated damages** subject to the limit of our liability stated in this endorsement." While this policy language promises coverage for "un-

compensated damages," the "subject to" clause immediately after that defined term clearly and plainly suggests to the ordinary person of average understanding that Shelter's liability for Lynch's uncompensated damages is not absolute but is subject to the "limit of our liability" in the policy. The application of this promise of coverage is straightforward and unambiguous under the other provisions in the policy endorsement.

A few paragraphs after the insuring agreement appears a section aptly titled, "LIMIT OF **OUR** LIABILITY." This section provides that Shelter will only be liable for the agreed-upon declared liability limit, which in this case is $50,000.00, subject to the "following limitations." Included in the list of limitations is subsection 2, which states, "The limit of liability stated in the Declarations will be reduced by all amounts paid or payable to the **insured** making the **claim** by, or on behalf of, all **persons** legally obligated to pay any portion of the **damages** to that **insured**." Here, the latter clause refers to Glavin, whose insurer paid $100,000.00 in damages to Lynch. The application of subsection 2 sets off the $100,000.00 paid by Glavin's insurer against the $50,000.00 declared liability limit for underinsured motorist coverage. Applying this straightforward calculation, the total amount due to Lynch under the UIM Endorsement is $50,000.00 minus $100,000.00, which equals an amount less than zero. Thus, Shelter owes zero to Lynch for uncompensated damages.

Given the clarity with which the policy states that Shelter will pay uncompensated damages "subject to" the limit of its liability and then later explicitly defines the contours of that limit, an ordinary person of average understanding could not read the policy endorsement provisions otherwise.

Moreover, this set-off language tracks the set-off language that was discussed and approved by the Supreme Court of Missouri in *Rodriguez*, 808 S.W.2d at 383. In that case, the insurance contract provided that "the limit of liability shall be reduced by all sums paid because of the 'bodily injury' by or on behalf of persons or organizations who may be legally responsible." *Id.* at 382. The Court held that this limitation on underinsured motorist coverage was "neither ambiguous nor misleading." *Id.* Likewise, we hold that the set-off provision here is similarly unambiguous.

*Rodriguez* is by no means an anomaly, for Missouri courts have long held that unambiguous set-off provisions in insurance policies are enforceable. In *Krombach v. Mayflower Ins. Co.*, the Supreme Court of Missouri found the set-off provision at issue to be ambiguous, but noted that the insurance company could have properly effected a set-off if it had only done so "in plain and unequivocal terms." 827 S.W.2d 208, 211 (Mo. banc 1992). The Court cited the policy in *Rodriguez* as an example of unambiguous set-off language. *Id. See also Nolan v. American States Preferred Ins. Co.*, 851 S.W.2d 720 (Mo. App.1993) (upholding the enforcement of an underinsurance policy reduction clause very similar to Shelter's in the case at bar). Most recently, in *Ritchie*, our Supreme Court affirmed unequivocally that unambiguous set-off provisions are enforceable, even though it construed the particular set-off provision at issue as ambiguous and in conflict with other sections of the policy. 307 S.W.3d at 140–41. In that case, the insurance company provided underinsured motorist coverage at a limit of $100,000.00 per person. *Id.* In a relevant footnote, the majority explained:

> The dissent is incorrect in characterizing this opinion as holding that limitation of liability clauses are never enforceable.

A policy that plainly states it will only pay the difference between the amount recovered from the underinsured motorist and $100,000 is enforceable. In such a case, the mere fact that $100,000 will never be paid out is not misleading, for the policy never suggests that this is its liability limit and never implies that it may pay out that amount. . . .

*Id.* at 141 n. 10.

■ Accordingly, in the instant case, Shelter's UIM Endorsement plainly states it will pay only the insured's "**uncompensated damages**" *subject to* the limit of liability contained in the UIM Endorsement.[2] The limits that follow make it clear that Shelter is only liable for the difference between the $50,000.00 coverage amount and any payments already made by the tortfeasor. The policy—while it contains a degree of nuance, in that one must read all the sections together before accurately understanding the limit of liability—never states or even implies that Shelter promises to pay the full amount of its coverage limit without first reducing amounts already paid by one legally obligated to do so. Indeed, "definitions, exclusions, conditions are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable." *Todd v. Missouri United School Ins. Council,* 223 S.W.3d 156, 163 (Mo. banc 2007).

Embedded within Lynch's argument is the assertion that "Shelter is entitled to twice reduce its limit of liability by all amounts paid to [Lynch] by the tortfeasor." Lynch not only failed to include this claim in her point relied on, but also failed to demonstrate in her argument how any such alleged double reduction occurs under any interpretation of the language used in the endorsement.

■ Lynch correctly points out that the endorsement employs the phrase, "the total amount paid or payable to an **insured** by, or on behalf of all **persons** legally obligated to pay those **damages**[,]" as part of the definition of "uncompensated damages" and that in the "LIMIT OF **OUR** LIABILITY" section, the declared limit of liability is "reduced by all amounts paid or payable to the **insured** making the **claim** by, or on behalf of, all **persons** legally obligated to pay any portion of the **damages** to that **insured**." Nowhere in her argument, however, does she explain or demonstrate how this parallel use of setoff language operates in a cumulative manner to allow or provide for a double reduction for the amounts paid by or on behalf of the tortfeasor in the amount due the insured under the endorsement. The definition of "uncompensated damages" addresses the existence and amount of such damages, a threshold coverage issue, while the limit of liability language addresses the amount payable by the insurer toward those damages, if they exist in the first instance. Lynch has failed to advance any other interpretation an ordinary person of average understanding would attach to these provisions that would allow the insurer a double reduction for the amounts paid by the tortfeasor.

2. We distinguish the policy in the present case from the one in *Ritchie,* which our Supreme Court determined to be ambiguous. In *Ritchie,* as the Court noted, the set-off provision on which the insurer relied "conflicted with the clear statement in other portions of the policy that the stated limit of liability is the 'most we will pay' and that 'we will pay up to the limits of liability shown in the schedule.' " *Ritchie,* 307 S.W.3d at 140. Here, Shelter's policy does not contain this "most we will pay" language, and furthermore contains the essential "subject to the limit of our liability" clarification that was not present in the *Ritchie* policy.

In support of this assertion, Lynch cites to *Buck v. Am. Family Mut. Ins. Co.*, 921 S.W.2d 96 (Mo.App.1996). *Buck* is not applicable because it involves a UIM policy with completely different language and structure than the policy at issue here. *Id.* at 97–98. There, set-off language was used in the definition of "underinsured motor vehicle" and in the limit of liability section that also expressly relied upon the "underinsured motor vehicle" defined term. *Id.* This cumulative use of set-off language was found to be duplicitous and, therefore, ambiguous. *Id.* at 98. Here, there is no such cumulative use of set-off language. The defined term "uncompensated damages" is not mentioned in the "LIMIT OF **OUR** LIABILITY" section. This difference alone distinguishes *Buck* without any need for further consideration of the other language and structural differences in the respective UIM policies.

Lynch also argues that to interpret the policy as allowing a set-off would render ambiguous and deceptive the UIM Endorsement's statement in the insuring agreement section that "we will pay the **uncompensated damages**[.]" Lynch might be right if the sentence ended at that point, but it does not. As we have discussed, the UIM Endorsement specifies that Shelter will pay uncompensated damages "subject to the limit of **our** liability stated in this endorsement." The language is unequivocal and the "LIMIT OF **OUR** LIABILITY" section sufficiently explains the application of the set-off. Lynch simply attempts to consider one portion of a sentence in isolation and lifted out of context in order to create ambiguity where none exists.

Lynch further argues that *Jones*, 287 S.W.3d at 693, controls and supports her construction of the policy language that would require Shelter to pay the declared

$50,000.00 limit of liability under each policy. This analysis is misguided, however, because the policy in *Jones* contained an obvious deficiency not present in the Shelter policy. It read:

> [*T]he most we will pay* will be the lesser of:
>
> 1. The difference between the amount of an insured person's damages for bodily injury, and the amount paid to that insured person by or for any person or organization who is or may be held legally liable for the bodily injury; or
>
> 2. **The limits of liability of this coverage**

*Jones*, 287 S.W.3d at 690.

The mistake in the policy, as the Court noted, is that it failed to include the following words at the end of the second option: "*minus the amount already paid to that insured person." Id.* at 691. Without these added words of clarification, the policy language implied that the insurance company would pay up to the full extent of its policy limits if that equaled the lesser of the two amounts, a promise that contradicted another section of the policy not reproduced here. *Id.* Due to this inconsistency, the Court held the policy to be ambiguous, for an insurance contract cannot promise coverage in one place and then take it away in another. *Id.* at 692–93. Shelter's policies here do not suffer from this mistake, for the UIM Endorsement plainly states that its limit of liability will be reduced by amounts paid by one legally required to make a payment, i.e., the tortfeasor. Because "the holding in *Jones* was specific to deficient drafting of a policy that created a promise to pay the full amount," *Jones* has no bearing on the outcome of this case. *See Ritchie*, 307

S.W.3d at 143 (Price, J., dissenting).[3]

Because of the clarity with which the underinsured motorist coverage is defined in the UIM Endorsement, we hold that the extent of the coverage is neither ambiguous nor misleading. Furthermore, the meaning of the set-off provision is plain and unequivocal. The $50,000.00 coverage limit provided for in the policy was properly reduced by the $100,000.00 payment from Glavin's insurer; therefore Lynch is not entitled to any payment from Shelter. Lynch's first point is denied.

### No ambiguity in anti-stacking provisions

■ Lynch claims in her second point that the trial court erred in granting summary judgment in favor of Shelter on the issue of stacking because the anti-stacking provisions in the UIM Endorsement are ambiguous. As a result, Lynch asserts that the anti-stacking provisions are not enforceable and, thus, the coverage provided by the four Shelter policies should be stacked to provide her a total of $200,000.00 in UIM coverage.

" 'Stacking' refers to an insured's ability to obtain multiple insurance coverage benefits for an injury either from more than one policy, as where the insured has two or more separate vehicles under separate policies, or from multiple coverages provided for within a single policy, as when an insured has one policy which covers more than one vehicle."

*Ritchie,* 307 S.W.3d at 135(quoting *Niswonger v. Farm Bureau Town & Country Ins. Co. of Missouri,* 992 S.W.2d 308, 313 (Mo.App.1999)). Because there is no statutory requirement in Missouri that drivers purchase underinsured motorist coverage, the limits of coverage and any stacking or anti-stacking provisions are determined by the contract entered into by the insured and the insurer—in this case, Shelter and Lynch. *See Noll v. Shelter Ins. Co.,* 774 S.W.2d 147, 151 (Mo. banc 1989). Therefore, as long as the policy language disallowing stacking is unambiguous, the anti-stacking provisions will be enforced according to their terms. *Seeck,* 212 S.W.3d at 132.

For convenience of the reader, we repeat here the relevant policy language related to stacking:

LIMIT OF **OUR** LIABILITY

The limit of liability for this Coverage will be the limit of liability stated for this particular endorsement number in the Declarations, subject to the following limitations:

. . . .

    (5) Regardless of the number of:

        (a) vehicles involved in the **accident,**

        (b) **persons** insured,

        (c) **claims** made, or

        (d) premiums paid,

the limits for this Coverage may not be added to, combined with, or stacked onto the limits of other under-

---

3. Similarly, Lynch's reliance on *Buck v. Am. Family Mut. Ins. Co.,* 921 S.W.2d 96 (Mo.App. 1996) is misplaced. The policy in *Buck* initially promised coverage without reservation by stating, "We will pay compensatory damages for bodily injury which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle[,]" while elsewhere limiting that coverage in the Limits of Liability section of the

policy. *Id.* at 97. The Eastern District of our Court determined that the application of the Limits of Liability section to deny the promised coverage "would completely take away on the one hand what [the policy] purports to offer with the other." *Id.* at 99. As discussed, *supra,* the promise of coverage here has the express reservation that it is subject to the limit of liability.

insured motorists coverage to determine the total limit of underinsured motorists coverage available to any **insured** for any one **accident.**

OTHER INSURANCE

If an **insured's claim** under this Coverage arises out of bodily injury sustained while **occupying** the **described auto,** no other policy of underinsured motorist insurance, issued by us will apply to such a claim. However, the insurance provided by this Coverage will apply as excess insurance over any other company's underinsured motorists insurance available to the **insured** as a result of the same **accident.** The insurance under this policy will then apply only if the total of the limits of all such other insurance is less than the limit of liability of this Coverage. In that instance, **we** will be liable, under this Coverage, for only that amount by which its limit of liability exceeds the total limits of all such other insurance.

Lynch contends that the broad anti-stacking language in subsection 5 of the "LIMIT OF **OUR** LIABILITY" section is ambiguous when read in conjunction with the first sentence of the "OTHER INSURANCE" section directly below it, because the latter provision describes only one *specific* circumstance where stacking is not permitted "while **occupying** the **described auto**[.]" Because her injuries did not occur while she was occupying a "described auto," Lynch argues "there is uncertainty as to whether subsection (5)'s anti-stacking language is to be applied to the particular facts of this case, or whether, as required by the anti-stacking language of the 'Other Insurance' provision, stacking is only to be

prohibited in the special situation where the insured is occupying the 'described auto.' " Lynch reasons that because the two anti-stacking provisions are unclear when taken together, they should be construed in her favor to permit her to stack the policies. This would yield a total coverage amount of $200,000.00 ($50,000.00 coverage limit multiplied by the four policies that covered Lynch at the time of the accident). After applying the set-off provision discussed in Lynch's first point, *supra,* stacking the policies in this manner could arguably allow Lynch to recover $100,000.00 from Shelter.[4]

As Lynch concedes, there is no reasonable uncertainty as to the meaning of subsection 5; it clearly disallows stacking in any and every circumstance. Shelter suggests that we focus on the clarity of subsection 5 and disregard the "OTHER INSURANCE" clause because it is irrelevant to this case, in that Lynch was not occupying the "described auto" covered by any of the Shelter policies at the time of the accident.

We initially note that Lynch is asking this Court to lift the first sentence of the "OTHER INSURANCE" section out of the context of that section and consider it in isolation as compared to the general anti-stacking provision in subsection 5 of the "LIMIT OF **OUR** LIABILITY" section. We are reluctant to do so because, as previously stated, "[c]ourts should not interpret policy provisions in isolation but rather evaluate policies as a whole." *Ritchie*, 307 S.W.3d at 135.

Considering the policy as a whole, the "OTHER INSURANCE" section addresses the existence, availability and relation-

---

4. In analyzing this point, we assume *arguendo* that the set-off amount is applied once to the total stacked amount of coverage rather than applied to each individual policy's limit of liability, which would deny any recovery. Given that neither party addressed this issue in their briefs and our determination that the coverages cannot be stacked in any event, this issue need not be addressed or decided.

ship of other UIM insurance to the coverage provided by this policy. It provides that the coverage under this policy is "excess insurance over any other company's underinsured motorists insurance available to the **insured** as a result of the same **accident.**" The first sentence clarifies that if the injury is "sustained while **occupying** the **described auto,**" this policy applies to provide such excess coverage to the exclusion of any other UIM insurance issued by the insurer. In this context, nothing in this section relates to stacking as Lynch concedes is prohibited by subsection 5 of the "LIMIT OF **OUR** LIABILITY" section.

Nevertheless, if we were to consider it out of context, as Lynch suggests, the issue before us, then, would be whether the first sentence of the "OTHER INSURANCE" section, which is seemingly redundant to the general anti-stacking provision in subsection 5 of the "LIMIT OF **OUR** LIABILITY" section, creates an ambiguity. We find it does not.

Although the first sentence of the "OTHER INSURANCE" section, when considered in isolation, is arguably superfluous and unnecessary in light of subsection 5 of the "LIMIT OF **OUR** LIABILITY" section, redundancy is not the same as ambiguity. *See Purdy v. Farmers Ins. Co. of Idaho,* 138 Idaho 443, 65 P.3d 184, 188 (2003) ("Although redundancy may be considered when interpreting an ambiguous provision in an insurance policy, redundancy does not by itself make an insurance policy ambiguous."). Moreover, the two provisions are harmonious and not in conflict, because both prohibit the insured from stacking multiple policies in the situation where the insured suffers bodily injury while occupying the "described auto" under a policy. This is not a situation where the policy allows stacking in one section and then reneges on that promise

in another section, *see Seeck,* 212 S.W.3d at 134, because neither of the provisions allow stacking.

In order to find ambiguity on this point, we would have to infer the existence of an additional sentence in the "OTHER INSURANCE" section. That sentence would read something like: "If the injury occurs while not occupying the described auto, stacking is permitted." We simply will not insert a sentence into a policy to create ambiguity where none exists, and this is essentially the leap that Lynch is asking us to make. *See Nolan,* 851 S.W.2d at 723 (stating that "[c]ourts will not create an ambiguity in order to distort the language of an unambiguous insurance policy."). Furthermore, it is unreasonable to think an ordinary person of average understanding would, after reading both anti-stacking provisions, assume and mentally insert that additional sentence and as a result be confused as to whether stacking is ever allowed under the policy.

Therefore, because the anti-stacking provisions are clear in meaning, we interpret them according to their terms. Lynch is not entitled to stack the underinsured motorist coverage in the four Shelter policies. Lynch's second point is denied.

### Decision

The trial court's judgment is affirmed.

BARNEY, P.J., and BURRELL, J., concur.