Carol J. LONG, Respondent,

v.

SHELTER INSURANCE COMPANIES, Appellant.

No. WD 73037.

Missouri Court of Appeals, Western District.

July 26, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 2011.

Application for Transfer Denied Dec. 6, 2011.

Stephen R. Bough and M. Blake Heath, Kansas City, MO, for Respondent.

Wm. Clayton Crawford and James P. Maloney, Kansas City, MO, for Appellant.

Before Division II: JAMES M. SMART, JR., Presiding Judge, and MARK D. PFEIFFER and CYNTHIA L. MARTIN, Judges.

MARK D. PFEIFFER, Judge.

Shelter Insurance Companies ("Shelter") appeals from the judgment of the Circuit Court of Clay County, Missouri ("trial court"), concluding that Carol J. Long ("Long"), individually and on behalf of the class of persons entitled to sue for the wrongful death of her husband, Vernie Ray Long ("Decedent"), could stack underinsured motorist ("UIM") coverage found

in seven policies of insurance issued by Shelter and that Shelter was not entitled to a "set off" based on money paid in settlement by the tortfeasor's liability insurer. We affirm.

### Facts and Procedural History

While the parties dispute the interpretation of the relevant insurance contracts, they do not dispute the underlying facts, which are: Decedent suffered severe injuries, ultimately leading to his death, when the Ford F–350 he was driving was negligently struck by a vehicle driven by Lucas W. Dray ("Dray"). Long is the surviving spouse of Decedent and, along with Decedent's mother and two daughters, comprise the entire class of persons statutorily[1] entitled to sue for the wrongful death of Decedent ("Wrongful Death Class"). The Wrongful Death Class sustained at least $450,000 in damages as a result of the injuries and death of Decedent.

At the time of the accident, Dray was insured for automobile liability in the amount of $50,000 per person; that sum was subsequently paid in settlement to the Wrongful Death Class on behalf of Dray, and Dray was released from further liability. Long, individually and on behalf of the Wrongful Death Class, sued Shelter for payment of UIM benefits under seven insurance policies issued to Mr. and Mrs. Long and which were in effect at the time of the car accident.

Shelter insured the Ford F–350 that Decedent was driving on the day of the accident with a policy of insurance providing UIM coverage of $100,000 per person.

The six other Shelter policies issued to Mr. and Mrs. Long all provided UIM coverage of $50,000 per person.

Shelter claimed that Long was only entitled to the UIM coverage of the policy insuring the Ford F–350 ($100,000) and that the UIM coverage policy limit was subject to a "set off" for the $50,000 paid on behalf of Dray. Thus, Shelter paid the Wrongful Death Class the sum of $50,000 in what it believed was a satisfaction of its obligation to provide UIM coverage under its seven policies issued to Mr. and Mrs. Long.

Long claimed on behalf of the Wrongful Death Class that: (1) Shelter was not entitled to a "set off" in the manner claimed by Shelter, and (2) the policies were ambiguously worded, thereby permitting stacking of all seven policies for total UIM coverage of $400,000.[2]

The parties each filed motions for summary judgment regarding their respective arguments as to the legal effect of the insurance policies in question, and the trial court ruled in favor of Long and against Shelter, ordering Shelter to pay an additional $350,000.[3]

Shelter appeals.

### Standard of Review

 The interpretation of an insurance contract, and the determination whether coverage provisions are ambiguous, are questions of law that we review *de novo*. *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). Where, as here, the trial court granted summary judgment, we

---

**1.** *See* § 537.080, RSMo 2000.

**2.** The trial court also arrived at an alternative basis for permitting UIM coverage stacking; but since we affirm the trial court on its ambiguity finding, we need not and do not address this alternative basis.

**3.** The trial court arrived at this calculation by starting with the stipulated total damages of $450,000, subtracting $50,000 from the total damages for the Dray liability payment, and subtracting $50,000 for the UIM coverage partial payment made by Shelter.

also apply a *de novo* standard of review. *Id.* Because the propriety of summary judgment is an issue of law, we do not defer to the trial court's order granting summary judgment. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993).

## Analysis

The determinative issue on appeal is whether the Shelter policies are ambiguous with regard to UIM coverage.

"Absent an ambiguity, an insurance policy must be enforced according to its terms." *Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007). Whether the language of an insurance policy is ambiguous is a question of law. *Haggard Hauling & Rigging Co., Inc. v. Stonewall Ins. Co.,* 852 S.W.2d 396, 399 (Mo.App. W.D.1993). "It is black-letter law that: 'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions.'" *Burns,* 303 S.W.3d at 509 (quoting *Seeck,* 212 S.W.3d at 132).

"Words or phrases in an insurance contract must be interpreted by the court in the context of the policy as a whole and are not to be considered in isolation." *Haggard Hauling & Rigging Co.,* 852 S.W.2d at 399. If we find that the language of the insurance contract is ambiguous, we construe it using the rules of contract construction. *Id.* "Moreover, '[i]n construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured.'" *Burns,* 303 S.W.3d at 509 (quoting *Seeck,* 212 S.W.3d at 132). In Missouri, this rule is more rigorously ap-

plied in insurance contracts than in other contracts. *Id.*

UIM coverage is intended to provide insurance coverage for insureds "who have been bodily injured by a negligent motorist whose own automobile liability insurance coverage is insufficient to fully pay for the injured person's actual damages." *Niswonger v. Farm Bureau Town & Country Ins. Co. of Mo.,* 992 S.W.2d 308, 313 (Mo.App. E.D.1999). UIM coverage is floating, personal accident insurance that follows the insured individual wherever he goes rather than insurance on a particular vehicle. *Id.* Missouri does not require UIM coverage either by statute or by public policy. *Rodriguez v. Gen. Accident Ins. Co. of Am.,* 808 S.W.2d 379, 383 (Mo. banc 1991); *Christensen v. Farmers Ins. Co.,* 307 S.W.3d 654, 657 (Mo.App. E.D.2010). Therefore, the contract between the insured and the insurer defines and limits coverage. *Rodriguez,* 808 S.W.2d at 383.

### Point I: "Stacking" of Limits of UIM Coverage

In its first point, Shelter argues that the trial court erred because Shelter claims the insurance policies unambiguously prohibit the stacking of UIM coverages.

"Stacking" is:

an insured's ability to obtain multiple insurance coverage benefits for an injury either from more than one policy, as where the insured has two or more separate vehicles under separate policies, or from multiple coverages provided for within a single policy, as when an insured has one policy which covers more than one vehicle.

*Niswonger,* 992 S.W.2d at 313. "An anti-stacking clause prohibits the insured from collecting on multiple coverage items or

policies from the same insurer for a single accident." *Ritchie v. Allied Prop. & Cas. Ins. Co.,* 307 S.W.3d 132, 138 (Mo. banc 2009). "In effect, it makes only one policy or coverage amount collectable." *Id.* Because Missouri statutes do not require UIM coverage, and because there is no public policy requirement that UIM coverage be stacked,[4] "if the policy language is unambiguous in disallowing stacking, the courts will not create such extra coverage." *Niswonger,* 992 S.W.2d at 313–14. But, if the policy language is ambiguous, then courts construe the policy in favor of the insured and allow stacking. *Id.* at 314.

At the time of the accident, Long and Decedent had seven contracts of insurance with Shelter. Policy Number 24–1–4530272–20 covered the Ford F–350 that Decedent was driving at the time of the accident. That policy included policy declarations, which declared UIM coverage limits of $100,000 per person. Each of the other six policies (24–1–4530272–30, 24–1–4530272–28, 24–1–4530272–26, 24–1–4530272–10, 24–1–4530272–14, and 24–1–4530272–4) included policy declarations declaring UIM coverage limits of $50,000 per person. The relevant provisions of each policy relating to UIM coverage are identical.

The UIM endorsement states, in pertinent part:

### MISSOURI UNDERINSURED MOTORIST ENDORSEMENT

INSURING AGREEMENT

If:

> (a) an **insured**[5] sustains **bodily injury** as a result of an **accident** involving the **use** of an **underinsured motor vehicle;** and
>
> (b) the **owner** or **operator** of that **underinsured motor vehicle** is legally obligated to pay some or all of the **insured's damages,**

**we** will pay the **uncompensated damages,** subject to the limit of **our** liability stated in this coverage.

. . . .

### ADDITIONAL AND REPLACEMENT DEFINITIONS USED [IN] THIS ENDORSEMENT

As used in this coverage,

. . . .

> (3) **Uncompensated damages** means the portion of the **damages** that exceeds the total amount paid or payable to an **insured** by, or on behalf of, all **persons** legally obligated to pay those **damages.**[6]

---

4. Unlike UIM coverage, uninsured motorist ("UM") coverage is mandated in the State of Missouri by section 379.203, RSMo Cum. Supp.2010, and provides a source of recovery for insureds who are legally entitled to recover damages for bodily injury caused by the negligent owner or operator of a completely uninsured motor vehicle. *Niswonger v. Farm Bureau Town & Country Ins. Co. of Mo.,* 992 S.W.2d 308, 313 (Mo.App. E.D.1999). "Missouri public policy flowing from this statute requires that multiple uninsured motorist coverages must be allowed to be stacked, and prevents insurers from including policy language denying such stacking." *Id.*

5. Certain words in Shelter's policy appear in **bold** type to indicate defined terms. Our

quoted portions of the policy include the words in **bold** type as they appear in the policy.

6. "Damages" is defined in the policy as "the full amount of money payable to an **insured** for **bodily injuries** that directly resulted from the **accident** involving the **underinsured motor vehicle. Damages** include **consequential loss.**" As stated previously, the parties stipulated that the "damages" were at least $450,000. Thus, under the definition of "uncompensated damages," the portion of the "damages" ($450,000) that exceeds the total amount paid ($50,000) by persons legally obligated to pay damages to the Wrongful Death Class is $400,000.

(4) **Underinsured motor vehicle** means a **motor vehicle** that is covered by a liability bond or insurance policy applicable to the **accident,** but its available limits are less than the full amount owed by the **owner** or **operator** of that **motor vehicle** for the insured's damages.[7]

. . . .

### OTHER INSURANCE

If an **insured** suffers **bodily injury** for which benefits are payable under this coverage, it applies as excess insurance over all other underinsured motorist insurance available to that **insured.**[8] [Excess Clause][9]

If underinsured motorist insurance is provided to an **insured** by one or more other insurance policies and it is impossible to reconcile the provisions of all applicable policies so as to determine the order in which benefits are payable under each, the benefits of this policy will be prorated, with all such other policies, based on the limits of each, up to the limit of the policy with the highest limit. [Pro Rata Clause][10]

All of the Shelter policies contain a separate provision located in the main body of the policy and not found in the UIM endorsement which states:

### OTHER INSURANCE IN THE COMPANY

If more than one policy **we** issued to **you** covers a **claim,** this policy covers only the proportion of **our** ultimate liability that its limits bear to the total limits of all **our** policies that cover the **claim. Our** total liability under all **our** policies will not exceed the highest limit of any one policy. This limitation does not apply to benefits payable under Parts III [AUTO ACCIDENTAL DEATH BENEFIT] or IV [UNINSURED MOTOR VEHICLE LIABILITY COVERAGE].

Shelter argues that the "OTHER INSURANCE IN THE COMPANY" section is a general anti-stacking provision and that Long's UIM coverage cannot exceed the highest limit of any one policy. Long contends that when read in conjunction with this general anti-stacking provision, the Excess Clause of the "OTHER INSURANCE" section in the specific UIM endorsement to the policies becomes am-

---

**7.** Notably, in *Rodriguez,* the definition for "underinsured motor vehicle" was specifically tailored to a vehicle "to which a bodily injury liability bond or policy applies at the time of the accident but its limit for bodily injury liability is less than the limit of liability for this coverage." *Rodriguez,* 808 S.W.2d at 381. In other words, the *Rodriguez* UIM endorsement specifically tied the definition to a comparison of liability policy limits from the injury-producing vehicle to the UIM endorsement policy limits for the insured's separate policy. Here, the "underinsured motor vehicle" definition compared the liability policy limits from the injury-producing vehicle to the total amount of damages owed by the negligent driver causing the injuries or, in this case, the fatality.

**8.** In *Ritchie v. Allied Property & Casualty Insurance Co.,* 307 S.W.3d 132 (Mo. banc 2009), our Supreme Court concluded that an excess

clause stating that the coverage is "excess" coverage over "any other collectible underinsured motorist coverage" is "more likely to create the impression that underinsured motorist coverage can be stacked." *Id.* at 139.

**9.** This paragraph is an "excess clause" that "make[s] the policy excess or payable after other policies." *Planet Ins. Co. v. Ertz,* 920 S.W.2d 591, 593 (Mo.App. W.D.1996).

**10.** This paragraph is a "pro rata clause" that "limit[s] the insurer's liability to a proportion of the total loss." *Planet Ins. Co.,* 920 S.W.2d at 593. Of course, in the instant case, the stipulated "total loss" is $450,000, such that after reduction for the $50,000 liability insurance payment, there remains a total unpaid loss of $400,000—equal to the total stacked UIM coverages under the subject Shelter policies—making a pro rata discussion irrelevant.

biguous. Long argues that the "OTHER INSURANCE" Excess Clause promises an insured that the specific UIM coverage sold by Shelter will provide excess coverage over all other UIM benefits, including other UIM benefits sold by Shelter, while the general anti-stacking language in the "OTHER INSURANCE IN THE COMPANY" paragraph takes it away; and this conflict raises an ambiguity as to the issue of stacking, entitling Long to stack UIM coverage in all seven policies.

We find *Chamness v. American Family Mutual Insurance Co.*, 226 S.W.3d 199 (Mo.App. E.D.2007), persuasive on this issue. In *Chamness*, like the present case, there was an "Other Insurance" section in the UIM endorsement of multiple insurance policies issued to the insured containing both a pro rata clause and an excess clause.[11] *Id.* at 201. In *Chamness*, like the present case, there was a general anti-stacking provision in the insurance policies, which stated (in almost identical form as the present case): "The total limit of our liability under all policies issued to [the insured] by [the insurer] shall not exceed the highest limit of liability under any one policy." *Id.* at 201–02. The *Chamness* court held that the two insurance policies covering the insured seeking UIM benefits

were ambiguous because the excess clause of the "Other Insurance" section appeared to provide coverage over and above any other applicable coverage, but the anti-stacking and set-off language indicated that such coverage was not provided. *Id.* at 207. Because of this ambiguity, the court construed the ambiguities in favor of the insured and held that she was entitled to stack her two policies with regard to UIM coverage. *Id.* at 208.

In its brief, "Shelter acknowledges the cases finding that an ambiguity is created when a policy includes an 'excess' clause such as that in the first paragraph of the 'OTHER INSURANCE' section of the UIM endorsement in addition to an anti-stacking provision." However, Shelter argues that applying the Pro Rata clause of the "OTHER INSURANCE" section somehow cures the effect of the ambiguity created by the Excess Clause. This argument, of course, is contrary to our Supreme Court's clear pronouncement that: "To the extent that other provisions of the policy could be read in isolation to prohibit such stacking, they at best create an ambiguity that, under settled law, must be resolved in favor of coverage." *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 134 (Mo. banc 2009).[12]

---

11. The excess clause in *Chamness* was much less broad than the excess clause in the instant case. The *Chamness* excess clause stated that "any insurance provided under this [UIM] endorsement for an insured person while occupying a vehicle you do not own is excess over any other similar insurance." 226 S.W.3d at 201.

12. We also note that in the *Ritchie* case, the excess clause from the UIM endorsement was far less broad than the present case. In *Ritchie*, the excess clause stated: "Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage." 307 S.W.3d at 137. Conversely, the present excess clause applies as "excess over all other

underinsured motorist insurance available to [the insured]." Like the present case, *Ritchie* is a UIM stacking case where the insurer claimed stacking was expressly unavailable under the insurance policy. In *Ritchie*, our Supreme Court relied upon its seminal decision in *Seeck v. Geico General Insurance Co.*, 212 S.W.3d 129, 133 (Mo. banc 2007), and concluded that where excess UIM coverage was promised at one provision of an insurance policy and taken away at another provision in the insurance policy (even where each clause read in isolation may have been unambiguously worded), the conflicting provisions created an ambiguity that must be resolved in favor of the insured—thereby permitting stacking of UIM coverage. 307 S.W.3d at 138.

A court is to determine the existence or non-existence of ambiguity in an insurance contract by construing the meaning of words of the contract as would a reasonable lay person in the position of the insured. *Niswonger*, 992 S.W.2d at 316. A court must interpret policy provisions not in isolation but as a whole. *Seeck*, 212 S.W.3d at 133. "Where an insurance policy promises the insured something at one point but then takes it away at another, there is an ambiguity." *Chamness*, 226 S.W.3d at 204. "Specifically, if 'an other insurance clause appears to provide coverage but other clauses indicate that such coverage is not provided, then the policy is ambiguous, and the ambiguity will be resolved in favor of coverage for the insured.'" *Id.* (quoting *Seeck*, 212 S.W.3d at 134).

Shelter relies on *Lynch v. Shelter Mutual Insurance Co.*, 325 S.W.3d 531 (Mo.App. S.D.2010), to support its argument that the anti-stacking provisions are unambiguous. However, we find the policy language in *Lynch* (i.e., a Shelter policy) distinguishable—particularly as it relates to anti-stacking of UIM coverage—from that in the policies presently under review (i.e., also Shelter policies).

In *Lynch*, a passenger negligently injured in a single-car accident in an underinsured vehicle brought an action against her own insurer (i.e., Shelter) seeking UIM benefits under four separate policies. *Id.* at 533. The "uncompensated damages" definition in *Lynch* was identical to the provision in this case. The "insuring agreement" language is substantially similar—both promising to pay the insured's uncompensated damages, subject to the limit of Shelter's liability stated in the UIM coverage. *Id.* at 534. However, the UIM "Limit of Liability" provision in the insurance policy examined in *Lynch* specifically stated that "the limits for this Cover-

age may not be added to, combined with, or *stacked* (emphasis added) onto the limits of other underinsured motorists coverage to determine the total limit of underinsured motorists coverage available to any **insured** for any one **accident**." *Id.* at 539–40. This *Lynch* UIM endorsement specific anti-stacking provision is absent from the UIM endorsements of the Longs' policies in the present case.

Furthermore, the UIM "Other Insurance" clauses in *Lynch* and this case are substantially different. In *Lynch*, the "Other Insurance" provision limited the insurer's liability to a claim for bodily injury "sustained while occupying the described auto" and provided that in such a case, "no other policy of [UIM] insurance, issued by us will apply to such a claim." *Id.* at 540. The paragraph continued:

> However, the insurance provided by this Coverage will apply as excess insurance over *any other company's underinsured motorists insurance* available to the **insured** as a result of the same **accident.** The insurance under this policy will then apply only if the total of the limits of all such other insurance is less than the limit of liability of this Coverage. In that instance, **we** will be liable, under this Coverage, for only that amount by which its limit of liability exceeds the total limits of all such other insurance.

*Id.* (italics added). Conversely, the "Other Insurance" provision in the Longs' Shelter policies states that the UIM coverage is "excess insurance over *all other underinsured motorist insurance* available to that insured."

Clearly, the policy language in *Lynch* and in this case is significantly different. In *Lynch*, the "Other Insurance" section specifically provided that the coverage under the policy was "excess over any other company's [UIM] insurance available to the insured" and further clarified that, if

the injury is "sustained while occupying the described auto," that policy applied "to provide such excess coverage to the exclusion of any other UIM insurance issued by the insurer." *Id.* at 541. "[B]ecause both [provisions] prohibit[ed] the insured from stacking multiple policies in the situation where the insured suffer[ed] bodily injury while occupying the 'described auto' under a policy," and the insured was not occupying the described auto when she was injured, the court held that Lynch was not entitled to stack the UIM coverage in her four Shelter policies. *Id.*

Unlike in the Longs' policies, the language in the UIM "Other Insurance" provision in *Lynch* is precise in specifically prohibiting stacking and in clarifying that the UIM coverage is excess over any other company's UIM insurance. In the Longs' policies, this specificity is lacking, and the provision could be reasonably interpreted by an ordinary person of average understanding to mean that Shelter's UIM coverage would provide excess coverage to all other UIM policies, whether sold by other companies or by Shelter. This, of course, is opposite from the general anti-stacking "OTHER INSURANCE IN THE COMPANY" provision of the insurance policy. Yet, "[w]here an insurance policy promises the insured something at one point but then takes it away at another, there is an ambiguity." *Chamness*, 226 S.W.3d at 204. "Specifically, if 'an other insurance clause appears to provide coverage but other clauses indicate that such coverage is not provided, then the policy is ambiguous, and the ambiguity will be resolved in favor of coverage for the insured.'" *Id.* (quoting *Seeck*, 212 S.W.3d at 134). Accordingly, the Longs' Shelter policy is ambiguous, and this ambiguity requires us to construe the policy against Shelter and to allow Long to stack the seven UIM policies.

Point I is denied.

## Point II: "Set Off" of Amount Paid by Tortfeasor Against UIM Limit of Liability for Coverage

 In its second point, Shelter argues that the "LIMITS OF OUR LIABILITY" provision in each of the seven insurance policies clearly and unambiguously provides for a reduction or "set off" of Shelter's UIM coverage limit under each policy by the $50,000 payment Long received from Dray, the responsible tortfeasor. Long contends that Shelter must pay the full $400,000 of UIM coverage under all seven policies because the policy language is ambiguous as the set-off provision provides coverage in one section and removes it in another.

 To determine whether an insurance policy provides coverage, we look to the insurance contract itself. *Md. Cas. Co. v. Huger*, 728 S.W.2d 574, 578–79 (Mo. App. E.D.1987). If an insurance policy is unambiguous, we enforce the policy as written. *Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 102–03 (Mo.App. W.D.2004). The insurance policy "must be given effect according to the plain terms of the agreement, consonant with the reasonable expectations, objectives and the intent of the parties." *State Farm Mut. Auto. Ins. Co. v. Univ. Underwriters Ins. Co.*, 594 S.W.2d 950, 953–54 (Mo.App. E.D. 1980) (citations omitted). We look to definitions in insurance policies to guide our interpretation, *Heringer*, 140 S.W.3d at 103, but when words or phrases are not defined in the policy, we look to the plain meaning of words and phrases as it would have been understood by an ordinary person of average understanding when buying the policy. *Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687, 690 (Mo. banc 2009). "'In construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary

person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured.'" *Ritchie*, 307 S.W.3d at 135 (quoting *Seeck*, 212 S.W.3d at 132). Specifically, the existence of UIM coverage and the ability of an insurer to set off stated coverage "'are determined by the contract entered between the insured and the insurer.'" *Id.* (quoting *Rodriguez*, 808 S.W.2d at 383). Thus, although other decisions construing set-off provisions and their effect on UIM coverage can be instructive, they are not dispositive in the absence of identical policy language. As a result, we must begin our analysis with the language in the Longs' Shelter policy.

All of the policies contain UIM endorsement A–577.5–A, which states in pertinent part:

### INSURING AGREEMENT
If:

(a) an **insured** sustains **bodily injury** as a result of an **accident** involving the **use** of an **underinsured motor vehicle;** and

(b) the **owner** or **operator** of that **underinsured motor vehicle** is legally obligated to pay some or all of the **insured's damages,**

**we** will pay the **uncompensated damages,** subject to the limit of **our** liability stated in this coverage.

. . . .

### ADDITIONAL AND REPLACEMENT DEFINITIONS USED [IN] THIS ENDORSEMENT
As used in this coverage,

. . . .

(3) **Uncompensated damages** means the portion of the **damages** that exceeds the total amount paid or payable to an **insured** by, or on behalf of, all **persons** legally obligated to pay those **damages.**

. . . .

### LIMITS OF **OUR** LIABILITY
The limits of liability for this coverage are stated in the **Declarations** and are subject to the following limitations:

. . . .

(4) The limits are reduced by the amount paid, or payable, to the **insured** for **damages** by, or for, any **person** who:

(a) is legally liable for the **bodily injury** to that **insured;** or

(b) may be held legally liable for the **bodily injury** to that **insured.**

The ordinary person of average understanding will realize, upon reading the insuring agreement, that the UIM endorsement affords the insured insurance for uncompensated damages. The ordinary insured will realize that "uncompensated damages" is in bold, and is thus defined. The ordinary insured will read the definition of "uncompensated damages" in the endorsement and will see that it means "damages that exceed the total amount paid or payable to an insured, by or on behalf of, all persons legally obligated to pay those damages." The ordinary insured will read this plain language to mean that the UIM endorsement will pay the insured the excess over and above what the insured receives from others who are liable to the insured. The ordinary insured will also see, however, that the right to receive "uncompensated damages" is plainly and clearly "subject to the limit of [Shelter's] liability *stated in this coverage.*" (Emphasis added.)

Thus, the ordinary insured must figure out what the phrase "subject to the limit of [Shelter's] liability *stated in this coverage*" means. If the ordinary insured looks at the top right corner of the endorsement, it states "Limits of Liability." Beneath that reference there are no numbers and the

"per person/per accident" amounts are left blank. Immediately below this, however, the ordinary insured will see that the endorsement states: "(This Coverage applies only when the endorsement number and limits of liability are stated in the **Declarations**.)" The ordinary insured will thus know that the limits of liability will be stated in the "Declarations." Once again, the ordinary insured will observe that the word "Declarations" is in bold, and is thus a defined term. The definition of "Declarations" (which notably does *not* appear in the UIM endorsement, but instead, in the general terms of the Shelter policy) provides, in pertinent part, that the Declarations "set [ ] out many of the individual facts related to your policy including ... *amounts of various coverages.*" (Emphasis added.)

So, based on this definition of "Declarations," the ordinary insured turns to the Declarations page. That page tells the ordinary insured the UIM "coverage" is $100,000 per person/$300,000 per accident.[13] The discussion of the ordinary insured's coverage on the Declarations page is not limited by any language suggesting the limits are subject to set-off or reduction. There is thus no reason for the ordinary insured to look any further to form the reasonable belief that the insured has obtained UIM coverage in the maximum amount of $100,000 per person/$300,000 per accident available to cover any excess damages incurred over and above those paid by others liable (in other words, the definition of "uncompensated damages" subject to the insured's reasonable interpretation of the phrase "limit of our liability *stated in this coverage.*").

To further reinforce this reasonable conclusion, the term "underinsured motor ve-

hicle" is referenced in the UIM endorsement's insuring agreement. It is also a bold term, alerting the ordinary insured to read the definition. When the ordinary insured does so, the insured will see that "underinsured motor vehicle" is defined as a "motor vehicle that is covered by a liability bond or insurance policy applicable to the accident, but its available limits are less than the full amount owed by the owner or operator of that motor vehicle for the insured's damages." Reading this definition reaffirms to an ordinary insured that the UIM endorsement, and in particular the insuring agreement, provides for "excess coverage" over and above what is paid by others who are liable up to the limits of the UIM coverage—$100,000 per person on the truck policy and $50,000 per person on each of the other six policies.

Lest any other confirmation of what an ordinary insured will conclude is necessary, we need only look to page 7 of the underlying Shelter policy, where "General Agreements on Which Insuring Agreements are Based" are described. These "General Agreements" apply to all insuring agreements (i.e., endorsements) and thus to the insuring agreement in the UIM endorsement. In the section entitled "**Your** Duty to Make Sure **Your** Coverages Are Correct," an ordinary insured is told that "You agree to check the **Declarations** each time you receive one, to make sure that: ... (2) the limit of [Shelter's] liability for each of those coverages is the amount **you** requested." This language further confirms that the phrase "subject to the limits of our liability *stated in this coverage* " as appears in the UIM endorsement insuring agreement MUST mean the coverage amounts shown in the Declarations Page.

---

**13.** This is the UIM "coverage" for the Ford F–350 truck involved in the wreck. The other six policies had UIM "coverage" identified in

the Declarations page as $50,000 per person/$100,000 per accident.

This brings us to the UIM endorsement's language addressing "Limits of Our Liability." Importantly, that section states as follows: "The limits of liability for this coverage are stated in the Declarations...." By using the SAME language which appeared in the UIM insuring agreement, this section of the UIM endorsement lures the ordinary insured into the belief, once again, that the phrase "limits of liability for this coverage" means what appears in the UIM insuring agreement, which means "limits of liability for this coverage set forth in the Declarations." The UIM "Limits of Liability" sentence continues with a phrase designed to attempt to take away UIM coverage previously afforded, stating: "... and are subject to the following limitations...." This is the first time anywhere in the Shelter policy or in the UIM endorsement that an ordinary insured could arguably have been placed on notice that what the policy had in several other places unequivocally afforded could in any manner be taken away. Simply put, this creates an ambiguity in that "where one provision of a policy appears to grant coverage and another to take it away, an ambiguity exists that will be resolved in favor of coverage." *Jones*, 287 S.W.3d at 689. We can, of course, resolve the ambiguity in favor of coverage in the present case—without ignoring the "Limit of Our Liability" language in the UIM endorsement—by construing the language just as the Missouri Supreme Court did in both *Jones* and *Ritchie*.

Indeed, *Jones v. Mid–Century Insurance Co.*, 287 S.W.3d 687 (Mo. banc 2009),[14] and *Ritchie v. Allied Property &*

*Casualty Insurance Co.*, 307 S.W.3d 132 (Mo. banc 2009), are controlling. In *Ritchie*, both the declarations page for the policy and the limit of liability provision stated that coverage was provided up to $100,000 per person, $300,000 per accident, for each of the three vehicles owned by the Ritchies, and stated in multiple places that "this is the most we will pay" and that the limit of liability was the maximum it will pay. 307 S.W.3d at 140. However, the set-off provision reduced the "amount of [UIM] coverage" by any amount paid to an insured person. *Id.* The *Ritchie* court pointed out that in *Jones* the set-off provision was subject to conflicting interpretations: in isolation, it could be read to permit the insurer to set off the amount already received from the tortfeasor from its stated limit of liability under the policy; however, other sections of the policy stated that the limit of liability was the most that the insured would pay. *Id.* "[W]here one section of an insurance policy promises coverage and another takes it away, the contract is ambiguous." *Id.* at 141. The *Ritchie* court noted that *Jones* resolved this conflict by construing the set-off provisions to mean " 'that in determining the total damages to which the [UIM] coverage will be applied, the amount of money already received from the tortfeasor must be deducted.' " *Id.* (quoting *Jones*, 287 S.W.3d at 693). This interpretation precludes a double recovery—the insured receives the policy limits only if, "after deducting the amounts already paid, damages equaling or exceeding those limits are still outstanding." *Id.* at 140. *Ritchie* applied the reasoning in *Jones* to the facts of that case,[15] deducting the amount

14. In *Jones,* our Supreme Court even offers alternative language that the insurer could add to its policy to remove the same type of "set off" ambiguity that exists in *Jones, Ritchie,* and the present case. *Jones,* 287 S.W.3d at 691. That suggested ambiguity-eliminating

provision is not part of the Shelter policy at issue in the present case.

15. In *Ritchie,* the total damages suffered by the wrongful death class (as established in a wrongful death trial against the tortfeasors)

received from the tortfeasors from the total damages, leaving the insurer responsible for the balance up to the UIM limit of liability. *Id.* at 141.

In the present case, each of the UIM endorsements of the Shelter policies states that Shelter "will pay the **uncompensated damages** subject to the limit of [Shelter's] liability stated in this coverage." "Uncompensated damages" are defined in each of the Shelter policies as damages exceeding the total amount paid to an insured by a person legally obligated to pay those dam-

ages. Thus, in this case, a person legally obligated to pay damages to the Wrongful Death Class paid $50,000 of the $450,000 in stipulated damages of the Wrongful Death Class. This leaves $400,000 of "uncompensated damages." This amount is equal to the combined and stacked UIM policy limits for all seven Shelter policies. Accordingly, Shelter must pay the limit of its stacked UIM policy coverage of $400,000, receiving credit for the $50,000 already paid.[16]

Point II is denied.

were $1.8 million, of which the tortfeasors had $60,000 of liability coverage policy limits available for payment and which was paid on behalf of the tortfeasors. 307 S.W.3d at 134. In the UIM claim, our Supreme Court concluded that, after receiving $60,000 on behalf of the tortfeasors and after applying a set-off of $60,000 toward the UIM claim, the remaining unsatisfied damages were $1.74 million, well in excess of the UIM coverage policy limits ($100,000 per person)—which our Supreme Court ordered the insurer to pay. *Id.* at 141. Conversely, the Supreme Court noted that if the total damages had been $140,000 and $60,000 was paid by the tortfeasors, the UIM claim would have been limited to $80,000 of the $100,000 in UIM coverage— thereby avoiding a double recovery for the insured. *Id.* Importantly, though, the Supreme Court applied the set-off (with insurance policy set-off language very similar to the policy language in the present case) to the *total damages*, not the *policy limit*, because the insurance policy did not unambiguously provide for the set-off to be applied to each individual insurance policy's coverage limit. *Id.* This is precisely the scenario and set-off formula similarly prescribed by our Supreme Court in *Jones*, and it is thus the formula we must use in the present case.

16. Shelter ignores the Missouri Supreme Court precedent from *Jones* and *Ritchie* and, instead, relies upon two opinions from the Southern District of this Court: *Lynch* and the recent Southern District decision in *Shelter Mutual Insurance Co. v. Straw*, 334 S.W.3d 592 (Mo.App. S.D.2011).

In *Lynch*, there are two critical differences between that insurance policy and the one in

our case justifying different outcomes. In *Lynch*, the UIM insuring agreement stated:
"If an insured sustains bodily injury as a result of an accident involving the use of a motor vehicle, and is entitled to damages from any person as a result of that bodily injury, we will pay the uncompensated damages subject to the limit of our liability *stated in this endorsement.*"
325 S.W.3d at 533 (emphasis added). *See Straw*, 334 S.W.3d at 596–97, where this language is identified. First, noticeably absent from the *Lynch* UIM insuring agreement is any reference to the phrase "underinsured motor vehicle," and thus, even if that term is elsewhere used or defined, the lack of reference to the phrase in the insuring agreement means that an ordinary insured could not have been confused by a definition of "underinsured motor vehicle" that reads (as in the present case) like excess coverage. Second, the promise to pay "uncompensated damages" (a term defined in the *Lynch* policy in a manner nearly identical to the definition in the Longs' Shelter policy) is subject to the limit of the insured's liability stated in the *endorsement*. *Id.* The difference between the phrase "stated in this coverage" used in the Longs' Shelter policy and the phrase "stated in this endorsement" used in the *Lynch* policy is critical. An ordinary insured would know, reading the *Lynch* UIM insuring agreement, that the insured must look elsewhere *in the endorsement* to determine the limits of liability to which the obligation to pay for uncompensated damages are subject. The *Lynch* endorsement describes these limits in only one place—the "Limits of our Liability" where the set-off provision appears. Unlike the insuring agreement in the Longs' Shelter policy, there is nothing in the *Lynch* insuring agreement

## Conclusion

For the foregoing reasons, the trial court's judgment is affirmed.

JAMES M. SMART, JR., Presiding Judge, and CYNTHIA L. MARTIN, Judge, concur.

which creates confusion about the amount of the UIM coverage. Thus, unlike the present case, there is no ambiguity in the *Lynch* policy.

In *Straw*, we note that the Southern District expressly noted that the insurance policy was "nearly identical" to the *Lynch* insurance policy, *Straw*, 334 S.W.3d at 596, and as we have pointed out in our ruling today, the *Lynch* insurance policy is significantly dissimilar from the insurance policy we are reviewing in the present case—particularly as it relates to UIM coverage. Second, because we have found the policy language of the Longs' Shelter policies to be different from the *Lynch* insurance policy, we have found ambiguities that were not present in the *Lynch* case. Thus, where *Straw* notes that it was reviewing a "nearly identical" insurance policy as the *Lynch* case, we do not have that fact pattern. Instead, the Longs' Shelter policies have ambiguities not present in the *Lynch* policy, and

the Longs' insurance policies are, instead, much more similar to the insurance policies addressed in *Jones* and *Ritchie*. We do note that the UIM insuring agreement in *Straw* is identical to the Longs' Shelter policy, *Straw*, 334 S.W.3d at 596–97, particularly in its use of the phrase "as stated in this coverage" versus the *Lynch* UIM insuring agreement phrase "as stated in this endorsement." But, it is impossible from the opinion in *Straw* to determine if the policy examined in that case contained all of the remaining provisions we have discussed in today's opinion, particularly the definition of "underinsured motor vehicle." If, however, the policy in *Straw* is identical to the Longs' Shelter policy examined in today's ruling, we agree with Judge Scott's dissent in *Straw* concluding that the opinion in *Straw* cannot be squared with the Missouri Supreme Court precedent in *Jones* and *Ritchie*, and we would decline to follow *Straw* for that reason.