Stanley FANNING, Respondent,

v.

PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, Appellant.

No. WD 75943.

Missouri Court of Appeals, Western District.

Aug. 27, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 2013.

Application for Transfer Denied Nov. 26, 2013.

Walter R. Simpson, Kansas City, MO, for respondent.

Nikki Cannezzaro, Kansas City, MO, for appellant.

Before Division Two: THOMAS H. NEWTON, Presiding Judge, KAREN KING MITCHELL, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

This case involves the interpretation of underinsured motorist provisions contained in a motorcycle insurance policy. The insured party, Stanley Fanning ("Fanning"), and the insurer, Progressive Northwestern Insurance Company ("Progressive"), filed cross motions for summary judgment. The trial court found the policy to be ambiguous and entered summary judgment in favor of Fanning. Progressive appeals. We affirm.

### Factual and Procedural History

The facts are undisputed. While riding his motorcycle, Fanning was involved in an accident with a vehicle operated by Kathleen Burnham ("Burnham") on June 26, 2010. The accident was caused by Burnham's negligence. Burnham was insured by GEICO Indemnity Company ("GEICO"), under a policy which provided liability coverage of $50,000 per person/$100,000 per accident. On Burnham's behalf, GEICO paid its policy limit of $50,000 to Fanning. At the time of the accident, Fanning was insured by Progressive, which had notice of and consented to Fanning's settlement with Burnham. Fanning's injuries and damages exceeded $100,000.

Progressive's motorcycle insurance policy with Fanning begins with a declarations page. After the declarations page, page 1 of the policy includes general definitions of fifteen defined terms that appear throughout the policy. There are additional definitions of certain terms contained in various other parts of the policy. Part III(B), titled "Underinsured Motorist Coverage," contains its own "additional definitions." Terms appearing in boldface type through-

out the policy are defined terms, and even the definitions sections include bolded terms which are separately defined.

"Declarations page" is defined in the general definition section as; "means the document showing your coverages, limits of liability, **covered motorcycles,** premium, and other policy-related information" and "may also be referred to as the Motorcycle Insurance Coverage Summary." [1]

Progressive's declarations page provides underinsured motorist coverage, subject to the terms outlined in the policy, with "limits" of "$50,000 each person/$100,000 each accident." The declarations page has a column titled "deductible," and includes deductibles for comprehensive coverage and collision coverage. As to underinsured motorist coverage, the declarations page does not state a deductible, nor does it alert to or identify any trigger, set-off, or any other listed limit of liability or any other limit of coverage.

Part III(B) of the policy contains the underinsured motorist coverage provisions, which grant coverage per the following:

**INSURING AGREEMENT**

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of **bodily injury:**

    1.   sustained by that insured person;

    2.   caused by an accident; and

    3.   arising out of the ownership, maintenance, or use of an underinsured motor vehicle.

We will pay under this Part III(B) only after the limits of liability under all ap-

---

1.  To be clear, bolded terms in this opinion appear in bold in the policy. Throughout the policy, any term appearing in bold print is a term that has a separate definition contained within the policy. Throughout this opinion, any bolded terms contained within material quoted from the policy constitute separately defined terms within the policy. In each instance, the bold is in the original and not added by this court.

plicable bodily injury liability bonds and policies have been exhausted by payment of judgments or settlements.

Part III(B) also contains the following additional definitions (again, not included in the general definitions section of the policy):

### ADDITIONAL DEFINITIONS

When used in this Part III(B):

1. "**Insured person**" means:

a. **you** or a **relative**;

b. any person while operating a covered **motorcycle** with the permission of **you** or a **relative**;

c. any person **occupying,** but not operating, a **covered motorcycle**;

d. any person who is entitled to recover damages covered by this Part III(B) because of **bodily injury** sustained by a person described in a, b, or c above.

2. "**Underinsured motor vehicle**" means a land motor vehicle or trailer of any type for which the sum of the limits of liability under all bodily injury liability bonds or policies applicable at the time of the accident is less than the coverage limit for Underinsured Motorist Coverage shown on the **declarations page.**

The underinsured motorist coverage provisions in the policy contain the following Limit of Liability clause:

### LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Underinsured Motorist Coverage is the most we will pay regardless of the number of:

1. claims made;
2. **covered motorcycles;**
3. **insured persons;**
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

\*     \*     \*.     \*     \*     \*

The Limits of Liability under this Part III(B) will be reduced by all sums: 1. paid because of bodily injury by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability to Others;

The underinsured motorist coverage provisions also include the following "other" insurance clause:

### OTHER INSURANCE

If there is other applicable underinsured motorist coverage, **we** will pay only **our** share of the damages. Our share is the proportion that our limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to a vehicle that is not a **covered motorcycle** will be excess over any other underinsured motorist coverage.

In their motions for summary judgment, the parties only dispute whether the Underinsured Motorist Coverage provisions provide coverage to Fanning for the injuries he sustained in the accident with Burnham. For purposes of the motions, the parties stipulate that Burnham was at fault for the accident and that Fanning's total damages exceed $100,000.

Based on the stipulated facts and the policy language, the trial court granted Fanning's motion for summary judgment, determining that there is an ambiguity as to the definition of "underinsured motor vehicle" and denied Progressive's motion for summary judgment. Whether there is an ambiguity in the policy which results in coverage, is the sole issue on appeal.[2] In

---

**2.** Fanning originally brought an additional cause of action for vexatious refusal to pay.

its two points on appeal, Progressive argues that the trial court erred in granting summary judgment to Fanning and in denying Progressive's motion for summary judgment.

Further facts are set forth below as necessary.

## Standard of Review

■ Our Supreme Court has set forth our standard of review:

Summary judgment is appropriate only when the moving party demonstrates that "there is no genuine dispute as to the facts" and that "the facts as admitted show a legal right to judgment for the movant." The movant bears the burden of establishing both a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment. The propriety of summary judgment is purely an issue of law, and this Court's review is essentially *de novo.* "As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment."

*Bob DeGeorge Assoc.'s, Inc. v. Hawthorn Bank,* 377 S.W.3d 592, 596 (Mo. banc 2012) (quoting *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 380 (Mo. banc 1993)) (citations omitted). The interpretation of an insurance policy is a question of law that we also determine *de novo. Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007) (citation omitted).

## General Principles of Interpretation

■ As the issue framed is solely one of interpretation of an insurance policy, we look to determine whether the insurance

policy language is ambiguous or unambiguous. *Blumer v. Automobile Club Inter– Ins. Exch.,* 340 S.W.3d 214, 218 (Mo.App. W.D.2011) (citation omitted); *Miller v. Ho Kun Yun,* 400 S.W.3d 779, 784 (Mo.App. W.D.2013). If no ambiguity exists, the insurance contract will be enforced as written. *Rodriguez v. Gen. Accident Ins. Co. of Am.,* 808 S.W.2d 379, 382 (Mo. banc 1991). If an ambiguity exists, we construe the language of the policy against the insurer. *Blumer,* 340 S.W.3d at 218. "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Seeck,* 212 S.W.3d at 132. When determining whether an ambiguity exists, "[w]ords or phrases in an insurance contract must be interpreted by the court in the context of the policy as a whole and are not to be considered in isolation." *Miller,* 400 S.W.3d at 784.

■ "To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy." *Blumer,* 340 S.W.3d at 218 (citation omitted). In other words, we apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance" and we resolve "ambiguities in favor of the insured." *Seeck,* 212 S.W.3d at 132 (citations omitted). "In Missouri, this rule is more rigorously applied in insurance contracts than in other contracts." *Long v. Shelter Ins. Co.,* 351 S.W.3d 692, 696 (Mo.App. W.D.2011) (citation omitted).

Ambiguities are construed in favor of the insured because:

(1) insurance is designed to furnish protection to the insured, not defeat it; ambiguous provisions of a policy designed

Pursuant to an agreement of the parties, that count was dismissed with prejudice.

to cut down, restrict, or limit insurance coverage already granted, or which introduce exceptions or exemptions, must be *strictly construed* against the insurer; and (2) as the drafter of the policy, the insurance company is in the better position to remove the ambiguity from the contract.

*Golden Rule Ins. Co. v. R.S.*, 368 S.W.3d 327, 334 (Mo.App. W.D.2012) (citation omitted) (emphasis added).

### Analysis

▮ Underinsured motorist coverage "is intended to provide insurance coverage for insureds 'who have been bodily injured by a negligent motorist whose own automobile liability insurance coverage is insufficient to fully pay for the injured person's actual damages.'" *Long*, 351 S.W.3d at 696 (citation omitted). This coverage is "floating, personal accident insurance that follows the insured individual wherever he goes rather than insurance on a particular vehicle." *Id.* Because Missouri does not require underinsured motorist coverage by statute or by public policy, the contract or policy between the insured and insurer defines the limits coverage. *Id.*

In this case, we agree with the trial court's holding that the policy was ambiguous as to the existence of underinsured motorist coverage for Fanning's injuries because conflicts in the definition of "declarations page," as well as in the provisions of the "insuring agreement" and the "limits of liability," create uncertainties as to the existence of coverage that require us to construe them against the insurer. We consider these findings of ambiguity in turn.

### Definition of "Declarations Page"

▮ We first hold that the policy is ambiguous as a result of a conflict between the policy definition of "underinsured motor vehicle," the policy definition of "decla-

rations page," and the language that actually appears on the declarations page. This court recently held that:

> The law is not concerned merely with what an ordinary insured would be caused to believe from reading his existing policy after a bodily injury has occurred. The law is also concerned with what an ordinary purchaser of insurance would be caused to believe about the coverage from review of the policy upon initial receipt of the policy, *before* an injury has occurred, while there remains time to adjust coverages in light of his or her understanding of the policy contents. The auto insurance purchaser, upon receipt of his policy (perhaps in the mail several weeks after purchase) will certainly read the declaration sheet to ensure no miscommunication about coverage levels, even if the purchaser reads little else. ***Therefore, it is essential that the language of the declaration sheet be part of the analysis in these UIM cases.***

*Miller*, 400 S.W.3d at 791 (bolded emphasis added) (internal citation omitted).

As noted above, "declarations page" is defined in the policy at hand and "means the document showing your coverages, limits of liability, **covered motorcycles,** premium, and other policy-related information." Pursuant to this definition, Progressive's declarations page must include "coverages" and "limits of liability." However, the declarations page indicates no limitation other than the monetary figure of $50,000/$100,000 for underinsured motorist coverage. This is in contrast to other provisions that show limitations in the form of deductibles on the declarations page. *See Miller*, 400 S.W.3d at 791 (upholding finding of ambiguity in part where declarations page showed the limit that the underinsured motorist coverage was

for "bodily injury only" but otherwise indicated no limitations).

The policy definition of "underinsured motor vehicle" is thus ambiguous because it defines the declarations page as inclusive of the "limits of liability" and "coverages" but then omits crucial information indicating a key trigger that affects the monetary limits and any set-off. An ordinary insured will learn from the definition of "declarations page," located on page 1 of the policy, that the limits of liability and coverages are required to be included on the declarations page. However, other than the simple monetary maximum, every other manner in which these maximum limits could be reduced (and quite often nullified) is nowhere to be found on the declarations page.

In *Miller*, we held that issues surrounding underinsured motorist coverage "must take into account the entire policy, *including the declarations page, which is generally less than clear that the coverage is designed by the insurer to be gap coverage rather than excess coverage.*" 400 S.W.3d at 787 (emphasis added). "The so-called 'limits' are expressed in the declaration sheet in a way that does not provide an alert for the ordinary insured that the coverage is gap coverage designed only to bring the insured to the same position the insured would have had if the tortfeasor's limits had equaled the insured's UIM coverage." *Id.*

In this case, there is no reason for the ordinary insured to look any further than the declarations page for the levels of coverage and limitations thereof, particularly in light of the policy's page 1 definition of "declarations page," to form the reasonable belief that the insured has obtained underinsured motorist coverage in the maximum of $50,000 per person/$100,000 per accident. But critically, there is no alert of a policy trigger requiring that the

tortfeasor's liability insurance be less than the amount shown on the declarations page and then that any such underinsured motorist coverage is reduced by payments (often made on behalf of the tortfeasor), which in many cases nullifies the coverage. In this case the insurer clearly told the insured in the definition of "declarations page" that this page contained the coverage and the limitations on coverage. The definition of "declarations page" does not indicate that the insured needs to look elsewhere in the policy for additional limitations. In short, using the terms of the insurance industry, there is no alert that the coverage is *gap* coverage rather than *excess* coverage. *Miller*, 400 S.W.3d at 787.

**Insuring Agreement and Limit of Liability**

■ In addition to holding that the definition of "underinsured motor vehicle" is rendered ambiguous by the declarations page (and by the definition of "declarations page" itself), we further hold that the Insuring Agreement and Limit of Liability portions of the policy also render the definition ambiguous by failing to include limiting language regarding the coverage. Our decision is governed by precedent holding that although the definition of "underinsured motor vehicle" taken alone can be unambiguous, the policy's set-off provision can create an ambiguity required to be resolved in favor of the insured. *See, e.g., Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687, 691–92 (Mo. banc 2009). This is true even where, because of the policy definition of "underinsured motor vehicle," the set-off provision should never come into play. In *Miller*, even though the policy amount was the same as the tortfeasor's liability policy limit, we upheld the judgment of the trial court that the set-off provision contributed to causing ambiguity

in the definition of "underinsured motor vehicle." 400 S.W.3d at 793.

Almost identical language from a critical portion of Progressive's Limit of Liability has previously been deemed ambiguous. As noted above, Progressive's Limit of Liability states:

> The limit of liability shown on the **declarations page** for Underinsured Motorist Coverage is the most we will pay regardless of the number of:
>
> 1. claims made;
> 2. **covered motorcycles;**
> 3. **insured persons;**
> 4. lawsuits brought;
> 5. vehicles involved in the accident; or
> 6. premiums paid.

Later in that same section, the policy includes what is commonly called a "set-off" provision:

> The Limits of Liability under this Part III(B) will be reduced by all sums: 1. paid because of bodily injury by or on behalf of any persons or organizations that may be legally responsible, including, but not limited to, all sums paid under Part I—Liability to Others....

In *Jones,* our Supreme Court determined that a similar set-off provision was overall inaccurate and misleading. 287 S.W.3d at 691–92. The *Jones* court examined language stating that "the most we will pay" is the lesser of the monetary policy limit or the difference between the damages and the payments already made.

*Id.* at 690. The court held that a "reasonable construction of this language is that the insurer will pay the full policy limits of $100,000 per person if that is the lesser of the two damage amounts listed." *Id.* at 690–91. The court's holding was reinforced by a nearby provision stating that the insurer "will pay up to the limits of liability shown in the schedule" and on the declarations page. *Id.* at 691. The *Jones* court rejected the insurer's reliance on this additional phrase: "[t]he amount of UNDERinsured Motorist Coverage we will pay shall be reduced by any amount paid or payable to or for an insured person." 287 S.W.3d at 691–92.

In so doing, the *Jones* court noted that there was no limiting language attending the promise to pay up to the limits of liability, thus creating an ambiguity as to whether the insurer could set off payments from the tortfeasor's insurer. The *Jones* court said the ambiguity in that policy could have been rendered clear simply by amending the policy to say that "the most we pay will be the lesser of . . . the limits of liability of this coverage minus the amount already paid to that insured person." *Id.* at 692. The *Jones* court determined that the insured would have recovered at least the statutorily required amount of coverage and therefore the insurer would never pay out the full amount of its stated limits of liability, rendering its set-off language misleading.[3] *Id.* at 692.

---

**3.** The *Jones* court's rationale is that the insured will always recover *something* that the insurer can then setoff because if the insured cannot recover any underinsured coverage, then the insured will recover uninsured coverage under section 303.030 of at least $25,000. RSMo.2000 (as currently supplemented). In *Miller,* we noted that regardless of what the insured recovers, "the purchaser (who may read the declaration sheet but not the terms of the endorsement upon receipt of

his or her copy of the policy) should be clearly advised that the coverage is in the nature of gap coverage and not excess coverage." 400 S.W.3d at 790, n. 10. The fact remains that not only is underinsured motorist coverage elusive under the language of this policy, but also the full extent of the coverage and its significant limitations are not clear to an ordinary person of average intelligence due to ambiguities in the policy.

In *Ritchie v. Allied Property and Casualty Insurance Company,* our Supreme Court examined language stating in relevant part that the "limit of liability shall be reduced by all sums … paid because of 'bodily injury' or by or on behalf of persons [or] organizations who may be legally responsible." 307 S.W.3d 132, 139 (Mo. banc 2009). *In Ritchie, our Supreme Court court considered virtually the same language as is in the case at bar.* Relying on *Jones,* the *Ritchie* court determined that this provision was ambiguous because, *as in this case,* the policy stated that "this is the most we will pay." *Id.* at 140. In reality, as was the case in *Jones,* the *Ritchie* court held that the insurer would never have to pay up to its policy limit because it would set off the payment from the tortfeasor. *See also Wasson v. Shelter Mut. Ins. Co.,* 358 S.W.3d 113, 124–25 (Mo.App. W.D.2011) (holding that the term "uncompensated damages" in set-off lacked a limiting phrase, thereby rendering set-off ambiguous); *Miller,* 400 S.W.3d at 793 (holding that language in the set-off provision contributed to ambiguity on the whole as to whether underinsured motor coverage was excess to tortfeasor's liability coverage).

■ "When an insurance policy unequivocally and unconditionally promises the insured something in one part of the policy, but then unexpectedly contradicts or undermines that promise in another part of the policy, it creates an ambiguity." *Wasson,* 358 S.W.3d at 125. In accordance, we find *Ritchie,* as applied in *Miller,* determinative of the case at bar. Here, the trial court was correct in determining that an ordinary person of average intelligence, reading the language relating to the insuring agreement, which did not contain meaningful limiting language about the substantial reduction, contributed to rendering the policy ambiguous as to coverage. Moreover, it is regretful that, under Progressive's argument, the true extent of underinsured motorist coverage is to be found in the definition of "underinsured motor vehicle," considered an "additional definition" and located after the insuring agreement portion of the underinsured motorist coverage. "While the phrase 'underinsured motor vehicle' may have a technical meaning in the insurance industry, it will not have such a technical meaning to the ordinary insured. The ordinary insured will view it in a practical way of meaning insurance that is inadequate for the level of damage." *Miller,* 400 S.W.3d at 792.[4] Therefore, it is of utmost importance to make the nature of the coverage, including triggers, limitations, and set-offs, crystal clear.

One hopes, as we urged in *Miller,* that insurers will "take the hint from *Ritchie* … to cause the declaration page and the endorsement to communicate the concept that the insurer will pay only the 'difference between the amount recovered from the underinsured motorist' (for bodily injury damage) and the sums specified in the declarations." *Id.* at note 9.[5]

---

4. The record includes Progressive's (undated) website explanation of "underinsured motorist coverage," which seems in conflict with its legal arguments. Described for the public on Progressive's website, "Underinsured Motorist coverage is designed to cover the gap between the other person's liability limits and the amount of your injury expenses, up to the Underinsured Motorist limits you select." The website definition seems to indicate that an insured is covered from the limit of the underinsured driver up to the amount on the declarations page, without reference to set-off and without a key trigger amount.

5. Fanning claims additional ambiguity in the policy's "other insurance" clause. As noted above, that provision states:

If there is other applicable underinsured motorist coverage, **we** will pay only **our** share of the damages. Our share is the

In our holding, we reject Progressive's overriding argument that, as a threshold matter, the policy definition of "underinsured motor vehicle" is unambiguous, thereby ending the analysis. Because Burnham's GEICO policy had limits of $50,000/$100,000 and because that sum is not less than the coverage limit shown on Progressive's declarations page (which instead is the same, $50,000/$100,000), Progressive asserts that underinsured motorist benefits are "negated" in this case and that ambiguity arising out of other provisions in the underinsured motorist coverage should not be addressed. In support, Progressive cites *Rodriguez v. General Accident Insurance Company of America*, in which our Supreme Court construed virtually the same definition of "underinsured motor vehicle" as unambiguous. 808 S.W.2d 379, 383 (Mo. banc 1991).

But Progressive's overly broad reliance on *Rodriguez* in this regard has been roundly rejected in numerous cases. *See, e.g., Miller,* 400 S.W.3d at 786 (citing several cases holding that a clear definition of "underinsured motor vehicle" does not end the analysis of whether a policy contains ambiguities). Rather, "the fact that a definition is clear and unambiguous does not

end the inquiry as to the existence of an ambiguity until the court has reviewed the 'whole' policy to determine whether there is contradictory language that would cause confusion and ambiguity in the mind of the average policy holder." *Id. See also Goza v. Hartford Underwriters Ins. Co.,* 972 S.W.2d 371, 374 (Mo.App. E.D.1998) (finding "no persuasive reason" why the definition of an underinsured motor vehicle should be viewed in isolation and separately from other provisions). And, key to this case, confusion and ambiguity in the policy as a whole regarding the nature of underinsured motor coverage is evident after examining multiple portions of the policy, including the definition of "underinsured motor vehicle," the declarations page, and other clauses. *Miller,* 400 S.W.3d at 793.

## Conclusion

In *Miller,* we rejected the insurer's argument that an ordinary insured of average intelligence with a certain amount of underinsurance motorist coverage, in this case $50,000, would understand from the policy that (1) the at-fault driver would not be the owner or operator of an "underinsured motor vehicle" where the at-fault

---

proportion that our limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to a vehicle that is not a **covered motorcycle** will be excess over any other underinsured motorist coverage.

Fanning argues that the term "excess" in the last sentence of the provision causes the reader to believe that the underinsured motorist coverage is excess over the tortfeasor's payment. *See e.g., Seeck,* 212 S.W.3d at 133; *Goza,* 972 S.W.2d at 375; *Ware v. Geico General Insurance Company,* 84 S.W.3d 99 (Mo. App. E.D.2002); *Zemelman v. Equity Mut. Ins. Co.,* 935 S.W.2d 673, 675 (Mo.App. W.D. 1996). Progressive argues that because the provision specifies that its coverage is excess over "any other underinsured motorist coverage," the ordinary policyholder of average intelligence would not operate under the as-

sumption that this is excess coverage over the tortfeasor's liability insurance.

But the second sentence of this provision states that Progressive's share is the "proportion that our limit of liability bears to the total of all available coverage limits." The objectionable, broad language of "all available coverage" found in cases such as *Seeck, Goza, Ware,* and *Zemelman* thus remains. In any event, although it is questionable what the ordinary policyholder of average intelligence would glean from this provision, our determinations about the declarations page, the definition of "declarations page," and the set-off provisions render the definition of "uninsured motor vehicle" ambiguous without an examination of the other-insurance provision, as was the case in *Miller.* 400 S.W.3d at 793. We therefore need not resolve this issue.

driver carried a liability policy with $50,000 of liability coverage—despite the amount of the injured policyholder's damages, and that (2) the underinsured policy limits of $50,000 would be reduced by the $50,000 received from the at-fault driver, resulting in no payout. *Miller*, 400 S.W.3d at 787–88, 793. We find similar, crucial faults in Progressive's failure—beginning with its declarations page, then to the definitions section on page 1 of the policy, and continuing throughout the section on underinsured motorist coverage—to make plain that its coverage was gap coverage and not excess coverage. The coverage that is unequivocally and unconditionally provided on both the declarations page and in the definition of the "declarations page" is taken away by limits found later within the policy. *Wasson*, 358 S.W.3d at 125. These ambiguities must be resolved in favor of coverage.

The judgment of the trial court is affirmed.

All concur.