

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| JOHN PATTY, D.O., LLC, | ) | No. ED106747 |
| | ) | |
| Plaintiff, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| and | ) | |
| | ) | |
| TRACY RENEE ALLBRITTON, et al., | ) | Honorable Maura B. McShane |
| | ) | |
| Plaintiffs/Appellants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MISSOURI PROFESSIONALS MUTUAL | ) | |
| PHYSICIANS PROFESSIONAL | ) | |
| INDEMNITY ASSOCIATION, | ) | |
| | ) | Filed: April 23, 2019 |
| Defendant/Respondent. | ) | |

## OPINION

Tracy Renee Allbritton ("Mother"), by and through her Guardian Letitia R. Rice, and

Liam Graham ("Child"), by and through his co-Guardians Letitia R. Rice and Steven M.

Allbritton (collectively "Appellants"), appeal from the judgment of the trial court granting

summary judgment against Appellants and in favor of Missouri Professionals Mutual-Physicians

Professional Indemnity Association ("MPM-PPIA") on Appellants' petition for a declaratory

judgment. Appellants assert nine points on appeal, arguing the trial court erred in granting MPM-

PPIA's motion for summary judgment and in denying Appellants' motion for summary

judgment. We reverse the judgment in favor of MPM-PPIA, and enter judgment in favor of Appellants pursuant to Missouri Supreme Court Rule 84.14.[1]

Factual and Procedural Background

This case involves a dispute regarding the interpretation of the liability limit clause ("Liability Limit") of a medical malpractice insurance policy (the "Policy"). The policy was issued by MPM-PPIA and insures John Patty, D.O. ("Doctor") for the medical malpractice claims filed by Appellants. Appellants' underlying claims against Doctor were resolved pursuant to a confidential settlement agreement between the parties (the "Settlement Agreement").[2] The Settlement Agreement disposed of all issues regarding MPM-PPIA's duty to indemnify Doctor and Doctor's liability to Appellants. The parties agree that, "[f]or purposes of this proceeding, it is essentially assumed that a jury concluded that [Doctor] was negligent." The only issue left unresolved in the Settlement Agreement was the maximum amount of professional liability insurance available to Doctor under the terms of the Policy, which would be determined by the court in this declaratory judgment action.

The sole issue in this case is whether, as a matter of law, Appellants' claims of negligence against Doctor are subject to one Liability Limit or two under the terms of the Policy. The only "facts" relevant to this determination are the language of the Policy and the content of Appellants' allegations of negligence asserted in their petitions.

**A.      *Appellants' Allegations of Negligence against Doctor***

---

[1] Rule 84.14 provides: "The appellate court shall award a new trial or partial new trial, reverse or affirm the judgment or order of the trial court, in whole or in part, or give such judgment as the court ought to give. Unless justice otherwise requires, the court shall dispose finally of the case."

[2] A copy of the "Memorandum of Understanding and Settlement Agreement" was filed under seal, therefore we discuss it only to the extent necessary to resolve the issues raised in this appeal.

Appellants each filed claims of medical malpractice against Doctor, alleging the following facts. Doctor is a physician specializing in obstetrics, including prenatal care, delivery, post-delivery care, and complications associated with pregnancy and delivery. Mother was Doctor's patient while she was pregnant with Child. During the third trimester, Mother began to have preterm contractions and abdominal pain. Doctor admitted Mother to the hospital, where he treated Mother and monitored Child's health. After four days in the hospital, Doctor discharged Mother. At the time she was discharged from the hospital, Mother still had ongoing symptoms and problems.

Doctor saw Mother in his office for a follow-up appointment the next day. The day after that, Mother returned to Doctor's office again because her symptoms were not improving. Following that appointment, Doctor did not give Mother any instructions to return. Three days later, Mother returned to Doctor's office with worsening symptoms. Doctor attempted to check Mother's blood pressure, but was unable to detect it. Doctor also monitored Child, who was not moving and had a heartrate that was low and falling.

Doctor concluded Child was in severe fetal distress and decided to perform an emergency cesarean section to save Child's life. Doctor performed the surgery in his office, where he did not have access to the medication, anesthesia, equipment, or personnel typically used when performing a cesarean section delivery. When Child was delivered, he was minimally responsive and had depressed respiratory and heart function. Doctor did not have the proper equipment to resuscitate Child, but Doctor attempted to do so until a pediatrician arrived. Following the delivery, both Child and Mother were transferred to the local hospital in critical condition.

As a result of complications from the caesarian section, Mother and Child sustained significant injuries and have permanent mental and physical disabilities. Mother has returned to

the hospital repeatedly due to complications and for additional operations. Mother is now permanently disabled, physically incapacitated, and will never be able to live independently again. She will require professional and supportive care and treatment for the remainder of her life. Child suffered significant, permanent, and irreversible brain and organ damage as a result of being deprived of oxygen and blood for a prolonged period of time. Child is now permanently disabled, physically incapacitated, and will require professional care and treatment for the remainder of his life.

Mother's petition contained numerous specific allegations regarding negligent acts and omissions committed by Doctor in treating Mother during the pregnancy, during the cesarean section, and following the delivery. Similarly, Child's petition contained numerous specific allegations regarding negligent acts and omissions committed by Doctor in treating Child during the pregnancy, during the cesarean section, and following the delivery.[3]

## B.    *Declaratory Judgment Action*

While Appellants' claims against Doctor were pending, Doctor filed a declaratory judgment action against MPM-PPIA and Appellants, asking the court to determine how the terms of the Policy applied to Appellants' claims. The Policy provided coverage for all claims of medical malpractice asserted against Doctor during the term of the Policy, subject to a Liability Limit of $1,000,000 per "Medical Occurrence."[4] Doctor asserted Appellants' claims constituted separate "Medical Occurrences" and were, therefore, subject to two Liability Limits under the terms of the Policy. MPM-PPIA contended Appellants' claims were subject to a single Liability Limit because their claims arose from the same "Medical Occurrence."

---

[3] The specific allegations of negligence contained in Appellants' petitions are set forth in the Discussion section below, to the extent necessary to resolve the issues raised in this appeal.

[4] The language of the Liability Limit and related provisions are set forth in the Discussion section below.

## C.    *Settlement Agreement*

While Doctor's declaratory judgment action was pending, Appellants, Doctor, and MPM-PPIA settled Appellants' claims against Doctor. Pursuant to the Settlement Agreement, MPM-PPIA agreed that the Policy covers the claims asserted by Mother and Child and conceded its indemnity obligation to Doctor for Appellants' claims. Appellants agreed to release and discharge their claims against Doctor in exchange for MPM-PPIA's agreement to pay the "maximum limit of the professional liability coverage provided to [Doctor] under and by [the] Policy[.]"

However, the Settlement Agreement did not resolve the question of whether the "maximum limit of professional liability" applicable to Appellants' claims was one Liability Limit or two. Instead, the Settlement Agreement made the actual amount of MPM-PPIA's liability contingent upon the outcome of Doctor's declaratory judgment action. MPM-PPIA agreed to pay Appellants a single Liability Limit upon execution of the Settlement Agreement, and an additional Liability Limit if the court in the declaratory judgment action determined Appellants' claims were subject to two Liability Limits.

## D.    *Cross-Motions for Summary Judgment*

Following the Settlement Agreement, the parties in the declaratory judgment proceeding were redesignated, with Appellants becoming plaintiffs together with Doctor, against MPM-PPIA as the sole defendant. Appellants and MPM-PPIA then filed cross-motions for summary judgment. Appellants' motion argued they were entitled to judgment as a matter of law because undisputed facts in the record demonstrated the Policy provided for two separate Liability Limits, in that Doctor's negligent treatment of Mother was a separate "Medical Occurrence" from Doctor's medical treatment of Child. Conversely, MPM-PPIA's motion argued it was

5

entitled to judgment as a matter of law because undisputed facts in the record demonstrated all claims asserted by Mother and Child were subject to a single Liability Limit in that they arose from a single "Medical Occurrence" and all treatment provided by Doctor was part of the same "course of treatment."

Following a hearing, the trial court denied Appellants' motion for summary judgment and granted MPM-PPIA's motion for summary judgment. In its judgment, the trial court concluded Appellants' claims were subject to a single Liability Limit because their claims arose from the same "Medical Occurrence." In interpreting the terms of the Policy, the court stated "[t]he term 'medical occurrence' also included all complaints that arise during a course of treatment." Based on this definition of "Medical Occurrence," the court found Appellants' claims were subject to a single Liability Limit because:

> A review of [Appellant]'s petitions shows that they both contain a series of allegations against [Doctor] claiming that he was negligent for acts and omissions during his furnishing services to and in the course of treatment of [Mother]. Conversely, there are no allegations in either Petition of any negligent act or omission in connection with any furnishing of services and/or in any course of treatment of [Child] by [Doctor].

This appeal follows.

Points on Appeal

Appellants' assert nine points on appeal, each arguing the trial court erred in granting MPM-PPIA's motion for summary judgment and Denying Appellants' motion for summary judgment.

In Point I, Appellants argue the trial court erred in interpreting the Policy because the definition of "Medical Occurrence" in Section X and the phrase "all complaints arising during a course of treatment" in Section VII are reasonably read to provide two Liability Limits.

6

In Point II, Appellants argue the trial court erred in interpreting the Policy because the Policy is a "claims made" policy and, unlike other provisions of the Policy, the Liability Limit applicable to Appellants' claims has no restriction on the number of claims.

In Point III, Appellants argue the trial court erred in concluding that the Policy only provides one Liability Limit because its interpretation of the phrase "course of treatment" as medical services to Mother but not unborn Child has no support in the policy and conflicts with medical reality.

In Point IV, Appellants argue the trial court erred in concluding that the Policy only provides one Liability Limit because an unborn child is a person separate from the mother as a matter of law and the Policy does not provide otherwise.

In Point V, Appellants argue the trial court erred in concluding that the Policy only provides one Liability Limit because the "cause approach" asserted by MPM-PPIA and adopted by the trial court in its judgment is inapplicable and contrary to the policy language.

In Point VI, Appellants argue the trial court erred in concluding that Doctor was allegedly negligent in acts or omission in furnishing medical services and a course of treatment to Mother alone because such analysis is beyond the question presented in that neither Doctor's liability nor MPM-PPIA's indemnity obligation is at issue, and MPM-PPIA conceded that acts alleged in each underlying lawsuit are covered claims under the Policy.

In Point VII, Appellants argue the trial court erred in concluding there is only one Liability Limit because MPM-PPIA failed to demonstrate a "Medical Occurrence" as to only one person in that facts material to whether there is one Liability Limit or two establish acts or omissions in furnishing medical services to Child, which MPM-PPIA did not deny occurred at

delivery, and as to which MPM-PPIA failed to raise any genuine dispute during the prenatal period.

In Point VIII, Appellants argue the trial court erred in concluding there is only one Liability Limit because ambiguities in the policy require interpretation in Appellants' favor and preclude judgment in favor of MPM-PPIA.

As a remedy, Appellants are asking this Court to reverse the trial court's order granting summary judgment in favor of MPM-PPIA, and enter judgment in favor of Appellants, pursuant to Rule 84.14.

Standard of Review

We review a trial court's decision granting summary judgment *de novo*. *Wilkes v. St. Paul Fire & Marine Ins. Co.*, 92 S.W.3d 116, 120 (Mo. App. E.D. 2002). Summary judgment is proper where the moving party has demonstrated there are no disputes regarding any material fact and the movant is entitled to judgment as a matter of law. *Id.* A genuine issue exists where the record contains competent materials which evidence two plausible, but contradictory, accounts of essential facts. *Id*. A genuine issue is not an argumentative, imaginary, or frivolous dispute. *Id*.

Defendants, such as MPM-PPIA, must establish: (1) the existence of facts negating an element of the plaintiff's claim, (2) the absence of evidence supporting the claim despite an adequate time for discovery, or (3) undisputed evidence supporting a properly plead affirmative defense. *Diehl v. Fred Weber, Inc.*, 309 S.W.3d 309, 317 (Mo. App. E.D. 2010). Claimants, such as Appellants, must establish that there is no genuine dispute as to those material facts upon which they would have had the burden of persuasion at trial. *Wilkes*, 92 S.W.3d at 120 (affirming summary judgment in favor of plaintiffs against insurer on claim of equitable garnishment

8

following agreement between plaintiffs and insured admitting liability and limiting damages to policy limit).

Additionally, the interpretation of an insurance policy and its application to undisputed facts are also questions of law we review *de novo*. *Psychiatric Healthcare Corp. v. Dep't of Soc. Servs., Div. of Med. Servs.*, 100 S.W.3d 891, 899 (Mo. App. W.D. 2003). We review the trial court's determination independently, without deference to that court's conclusions." *Id.*

Discussion

Although each of Appellants' points on appeal assert a different legal basis for reversing the trial court's decision granting summary judgment, the ultimate issue central to each claim of error is the same: Did the trial court err in concluding that Appellants' claims against Doctor are subject to a single Liability Limit under the terms of the Policy? This question requires us to interpret the Policy and apply its terms to the undisputed facts of this case. Each of Appellants' points on appeal requires us to conduct this same basic analysis. Therefore, for the sake of clarity and brevity, we address Appellants' claims together. *See State ex rel. AG Processing, Inc. v. PSC*, 276 S.W.3d 303, 307 (Mo. App. W.D. 2008) ("Because the points raised overlap, they will be discussed together.").

All issues regarding MPM-PPIA's duty to indemnify Doctor and Doctor's liability to Appellants were resolved in the Settlement Agreement, pursuant to which Appellants agreed to discharge and release their claims against Doctor, and MPM-PPIA agreed to pay the "maximum limit of the professional liability coverage provided to [Doctor] under and by [the] Policy[.]" MPM-PPIA also agreed the Policy covers the claims asserted by Mother and Child and conceded its indemnity obligation to Doctor for the claims. Further, the parties agreed that, "[f]or purposes of this proceeding, it is essentially assumed that a jury concluded that [Doctor] was negligent."

9

The sole question we must address in this case is whether, as a matter of law, the claims of negligence asserted by Mother and Child, as alleged in their petitions, are subject to one Liability Limit or two under the terms of the Policy. The only "facts" material to this determination are the language of the Policy and the allegations contained in Appellants' negligence claims against Doctor. Because neither party disputes the authenticity of the copies of the Policy or Appellants' petitions contained in the record, all of the material facts in this case are necessarily undisputed and there are no genuine issues of material fact for the purposes of our summary judgment analysis.

## I.      Interpretation of the Policy

We must first interpret the language of the Policy. An insurance policy is a contract, the interpretation of which is a question of law. *Ritchie v. Allied Property & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009). "If a term within an insurance policy is clearly defined, the policy definition controls." *Vega v. Shelter Mut. Ins. Co.*, 162 S.W.3d 144, 146 (Mo. App. W.D. 2005); *Shelter Mut. Ins. Co. v. MacVittie*, 423 S.W.3d 252, 255 (Mo. App. W.D. 2013). However, "[w]hen a term is not defined by the insurer, we are free to give a reasonable construction to the term, applying general contract principles and resolving doubts in favor of the insured." *Golden Rule Ins. Co. v. R.S.*, 368 S.W.3d 327, 338 (Mo. App. W.D. 2012) (quotations and citations omitted).

When construing undefined language in an insurance policy, we will "appl[y] the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolve[] ambiguities in favor of the insured." *Ritchie*, 307 S.W.3d at 135. Ambiguity exists "when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Id*. Language is ambiguous if it is susceptible to more than one

10

reasonable construction. *Id*. Provisions of an insurance policy should not be interpreted in isolation, but rather in light of the policy as a whole. *Id*. "If no ambiguity exists, the insurance contract will be enforced as written." *Maxam v. Am. Family Mut. Ins. Co.*, 504 S.W.3d 124, 126 (Mo. App. W.D. 2016) (quoting *Fanning v. Progressive Northwestern Ins. Co.*, 412 S.W.3d 360, 364 (Mo. App. W.D. 2013)).

The only provision of the Policy at issue in this case is the Liability Limit. The maximum limit of professional liability coverage is governed by Section VII of the Policy, which states:

> 1. COVERAGE A – INDIVIDUAL PROFESSIONAL LIABILITY, AND COVERAGE C PARTNERSHIP, ASSOCIATION OR CORPORATION PROFESSIONAL LIABILITY
> Our total liability for amounts paid by us for all damages because of injury arising out of any one medical occurrence to which this insurance applies, including all complaints arising during a course of treatment, will not exceed the amount shown in the declarations as "Each Medical Occurrence."

The term "Medical Occurrence" is defined in Section X of the Policy, which provides:

> "'Medical Occurrence' means any act or omission:
>     A.  Under Coverage A – Individual Professional Liability:
>         (1) in the furnishing of professional medical services by the Insured [Doctor], or which should have been provided by anyone for whom the Insured is legally responsible.
>     . . .
>     Any such act or omission, together with all related acts or omissions in the furnishing of such services to any one person shall be considered one medical incident or occurrence."

The parties agree that the Policy provides for a separate Liability Limit for each "Medical Occurrence." Therefore, the only question is how to interpret the term "Medical Occurrence." Because "Medical Occurrence" is a defined term, we must use the meaning ascribed to this term in its definition, which is "any act or omission . . . in the furnishing of professional medical services by [Doctor] . . . together with all related acts or omissions in the furnishing of such services to any one person." *See Vega*, 162 S.W.3d at 146. Although the Policy initially defines

11

"Medical Occurrence" as "any act or omission," which is singular, the Policy expands this narrow definition to include "all related acts or omissions in the furnishing of such services to any one person." Notably, this language expanding the definition of "Medical Occurrence" to include other "related acts or omission" expressly requires the "related acts or omissions" to arise from the furnishing of medical services "to any *one* person." (emphasis added). An ordinary person of average understanding purchasing medical malpractice insurance would understand this language in the definition of "Medical Occurrence" to mean that medical treatment provided to different people constitutes separate "Medical Occurrences," which are subject to separate Liability Limits. Therefore, the definition of "Medical Occurrence" cannot reasonably be interpreted to include all acts or omissions in providing medical services to multiple individuals.

MPM-PPIA agrees that the definition of "Medical Occurrence" contained in Section X of the Policy is controlling, and argues "[t]he only reasonable interpretation of that definition is that a series of related and allegedly negligent acts and omissions by an obstetrician caring for a pregnant patient constitute a single 'Medical Occurrence.'" In support of this argument, MPM-PPIA relies, in part, on language of the Liability Limit provision of the Policy stating "all complaints arising during a course of treatment" are subject to the same Liability Limit. MPM-PPIA's interpretation is incomplete because it does not address all the material facts in this case and it is premised on the assumption that "there was no claim that [Doctor] was negligent in providing care to [Child] after he was delivered."

Even if MPM-PPIA's proposed interpretation addressed all the facts in this case, we could not accept it because it would require us to ignore language regarding treatment to "any one person," which is actually part of the definition of "Medical Occurrence," in favor of the much more vague term "course of treatment," which is not part of the definition. *See McGuire v.*

12

*Lindsay*, 496 S.W.3d 599, 608 (Mo. App. E.D. 2016) (rejecting an interpretation of a contract that would have required the court to ignore language in the contract). We must interpret the language of an insurance policy in the context of the policy as a whole. *MacVittie*, 423 S.W.3d at 255-56. Words or phrases "cannot be considered in isolation," and "[s]eeming contradictions in an insurance policy must be harmonized if reasonably possible." *Id*. (alteration in original, quotations and citations omitted). Because the reference to "all claims arising during a course of treatment" is not part of the definition of "Medical Occurrence," it cannot alter the unambiguous meaning of the term, as defined in Section X of the Policy. *See Vega*, 162 S.W.3d at 146 ("If a term within an insurance policy is clearly defined, the policy definition controls."). The Policy defines "Medical Occurrence" in terms of treatment provided "to any one person," not treatment provided during a "course of treatment." Therefore, the phrase "course of treatment" must be interpreted to mean "course of treatment [provided to any one person]."

Unlike MPM-PPIA's proposed interpretation, our interpretation of "Medical Occurrence" is consistent with all language in the Policy, including the language stating that a Medical Occurrence "include[s] all complaints arising during a course of treatment." An ordinary person of average intelligence purchasing insurance would understand the phrase "course of treatment" to mean related medical treatment provided one person, not related medical treatment provided to separate persons. However, even if we were to find the "course of treatment" language rendered the Policy ambiguous, we would be required to construe the ambiguous language against the insurer. *Progressive Nw. Ins. Co. v. Talbert*, 407 S.W.3d 1, 9 (Mo. App. S.D. 2013).

MPM-PPIA also argues the reference to "any one person" cannot mean that there is a separate "Medical Occurrence" for each person because the Liability Limit is per occurrence, not per person. We disagree. Our interpretation of the policy would not create a *de facto* per person

13

Liability Limit. There are many instances in which negligent medical treatment of one person could give rise to claims by more than one person, which would be subject to a single Liability Limit. For example, in a claim for loss of consortium where negligent medical treatment of a patient causes a loss of consortium to the spouse. Under our interpretation of the Policy, both spouses' claims arise out of the course of treatment of one person and are, therefore, part of the same "Medical Occurrence" and subject to a single Liability Limit.

An ordinary person of average understanding purchasing insurance would understand the term "Medical Occurrence" to include any related acts or omissions in providing medical treatment to one person, but not acts or omissions in providing medical treatment to a different person. There is no "duplicity, indistinctness, or uncertainty" in this language, see *Ritchie*, 307 S.W.3d at 135, at least not as applied to the material facts of this case, as explained below. *See Golden Rule Ins. Co.*, 368 S.W.3d at 338 (the fact the terms of an insurance policy may be ambiguous when applied to one set of facts does not make them ambiguous as to other facts that come directly within the purview of such terms). Therefore, we find the definition of "Medical Occurrence" contained in the policy to be unambiguous.

## II.  Application of the Policy to the Undisputed Facts of this Case

Having found the relevant provisions of the Policy are unambiguous, next we must now apply these unambiguous terms to the undisputed facts of this case. The parties agree that the Policy provides for a separate Liability Limit for each "Medical Occurrence." However, the parties disagree about whether a physician's conduct in providing, or failing to provide, medical services to an expectant mother during and prior the delivery of her child constitutes a separate "Medical Occurrence" from the physician's conduct in providing, or failing to provide, medical services to the mother's child while *in utero*, during the delivery, and following the delivery. The

parties also disagree about whether there were allegations of negligence regarding Doctor's conduct after the delivery, as well as whether these allegations are material to the resolution of this case.

We acknowledge certain facts in this case related to Doctor's conduct in providing medical treatment prior to Child's delivery could raise difficult questions regarding whether tests and procedures performed by a physician to monitor an unborn child constitute medical treatment of the unborn child or the mother carrying it. However, we need not address these issues in this case because the allegations of negligence in Child's petition were not limited to Doctor's conduct in providing prenatal care to Mother. As explained below, Appellants also alleged Doctor was negligent in delivering Child and in treating child immediately after the delivery. The allegations of post-delivery negligence are dispositive in this case because, even if the terms of an insurance policy "may be ambiguous where applied to one set of facts[, this] does not make them ambiguous as to other facts [that] come directly within the purview of such terms." *Golden Rule Ins. Co.*, 368 S.W.3d at 338 (quotation and citation omitted).

It is undisputed that Doctor attempted to resuscitate Child after the delivery. Under the terms of the Policy, as interpreted above, Appellants' claims would be subject to two Liability Limits if *any* of the allegations of negligence regarding Doctor's treatment of Child constituted a separate "Medical Occurrence" from the allegations of negligence regarding Doctor's treatment of Mother. Therefore, the only question is whether Child's petition alleged Doctor was negligent in attempting to resuscitate Child after the delivery. We find that it did.

Child's petition alleged Doctor was negligent in attempting to resuscitate Child after the delivery because Doctor did not have the proper resuscitative and supportive equipment and staff available when he delivered Child. Specifically, Child's petition alleged:

15

k. [Doctor] negligently and carelessly failed to recognize obvious indications that [Child] [was] not likely to successfully tolerate an emergency cesarean section in the setting described above, and without the benefit of timely and proper medical and nursing support including but not limited to *proper resuscitative and supportive equipment, medications, and medical and nursing expertise*;

l. [Doctor] knowingly undertook to provide surgical services to deliver [Child] *without the requisite staff or equipment to manage the conditions of [Child]* . . . ;

. . .

22. As a direct and proximate result of the professional negligence and carelessness of [Doctor], [Child] suffered severe, permanent and irreversible injuries, including but not limited to neurological injuries and multiple organ damage, which has caused, and will forever cause in the future, [Child] to experience pain, suffering, and pronounced disability, including but not limited to seizures, cognitive, hearing and/or visual impairment, the inability to fully control his arms and legs and, in general, the inability to engage in meaningful life experiences.

(emphasis added).

We agree with Appellants that these allegations assert Doctor was negligent in providing medical treatment to Child after the delivery, at a time when Child was indisputably a separate person from Mother. Accordingly, they constitute a "Medical Occurrence," as defined in Section X of the Policy, separate from Doctor's conduct in treating Mother prior to the delivery and are, therefore, subject to a separate Liability Limit under Section VII of the Policy.

Here, however, the trial court granted summary judgment in favor of MPM-PPIA based on its finding that "there are no allegations in either [of Appellants'] Petition[s] of any negligent act or omission in connection with any furnishing of services and/or in any course of treatment of [Child] by [Doctor]." Similarly, the arguments in MPM-PPIA's brief are all premised upon its assertion that "there was no claim that [Doctor] was negligent in providing care to [Child] after he was delivered." Because we find this assertion is not supported by the record, the judgment must be reversed.

MPM-PPIA's principal argument is that all of Doctor's acts and omission prior to and including the delivery were part of the same "Medical Occurrence" because the only person being treated by Doctor prior to Child's birth was Mother. MPM-PPIA cites numerous cases in

16

support of this argument. Although none of these cases are directly on point, several support the proposition that a child's claim for prenatal injuries sustained *in utero* "arises from negligent treatment allegedly delivered to mother."[5] However, each of these cases are distinguishable because none deal with negligence occurring during or after the delivery.

MPM-PPIA also argues any allegations of negligence regarding the delivery or post-delivery care would be immaterial because evidence produced during discovery established that Child's brain injury occurred prior to the delivery. In support of this argument, MPM-PPIA cites to the deposition testimony of Appellants' causation witness, who opined that Child's brain injury occurred "within the last one to two hours . . . up to and including delivery."

We find MPM-PPIA's argument to be both unpersuasive and inaccurate. MPM-PPIA is improperly attempting to litigate a question that is not at issue in this proceeding, whether Child could prove all the elements of its negligence claim regarding Doctor's conduct in delivering Child and attempting to resuscitate him after the delivery. MPM-PPIA's argument challenges causation, which is an essential element of a medical malpractice claim. *See Echard v. Barnes-Jewish Hosp.*, 98 S.W.3d 558, 565 (Mo. App. E.D. 2002). However, as MPM-PPIA has conceded, it is assumed for the purposes of this proceeding that the jury would have found Doctor was negligent based on the allegations asserted in Child's petition. In order to find Doctor negligent, the jury necessarily would have found Child's injuries were caused by Doctor's

---

[5] *See, e.g.*, *Lough v. Rolla Women's Clinic, Inc.*, 866 S.W.2d 851, 852 (Mo. banc 1993) (error in reading blood test during prior pregnancy, two years prior to plaintiff's conception); *Bergstreser v. Mitchell*, 577 F.2d 22, 24 (8th Cir. 1978) (negligent prior cesarean section, two years prior to plaintiff's conception); *Igwilo v. Prop. & Cas. Ins. Guar. Corp.*, 131 Md. App. 629, 634, 750 A.2d 646, 648-49 (failure to diagnose plaintiff's mother with preeclampsia two weeks prior to delivery); *Simpson v. Roberts*, 752 S.E.2d 801, 802 (Va. 2014) (negligent performance of a prenatal procedure to determine whether plaintiff was mature enough to induce early labor). In each of these cases, the negligent medical treatment at issue occurred prior to the plaintiff's delivery. In *Lough*, the only Missouri case cited, the negligent conduct occurred before the plaintiff was even conceived. *Lough*, 866 S.W.2d at 852. MPM-PPIA cites no cases where the plaintiff alleges the doctor was negligent either in performing the delivery or in treating the child after the delivery.

negligence. If MPM-PPIA wanted to challenge the evidence supporting causation in Child's negligence claim, it could have litigated the issue at trial. Instead, MPM-PPIA decided to settle Child's claims, thereby foreclosing any challenge to causation. MPM-PPIA's attempt to relitigate causation in this proceeding is unavailing.

Moreover, MPM-PPIA's argument mischaracterizes the evidence it purports to rely on. After Appellants' causation expert made the statement relied on by MPM-PPIA, the expert also testified that "the degree of brain injury" can be impacted by "oxygenation and things that are done *during the resuscitation.*" (emphasis added). Based on this testimony, Doctor's acts or omissions in furnishing medical treatment to Child after the delivery constitute a separate "Medical Occurrence" that negligently caused Child's injury.

For the foregoing reasons, we find the plain language of the Policy provides for two Liability Limits under the undisputed facts of this case. Accordingly, the trial court erred in granting summary judgment in favor of MPM-PPIA.

### III. Appellants' Entitlement to Judgment as a Matter of Law

Appellants argue the trial court erred in denying their motion for summary judgment because the undisputed facts demonstrating MPM-PPIA is not entitled to judgment as a matter of law, also conclusively establish Appellants are entitled to judgment as a matter of law. We agree.

The denial of a motion for summary judgment is generally not appealable because it is not a final judgment. *Bob DeGeorge Assocs. v. Hawthorn Bank*, 377 S.W.3d 592, 596-97 (Mo. banc 2012). "In rare circumstances, however, the overruling of a party's motion for summary judgment can be reviewed when its merits are intertwined completely with a grant of summary judgment in favor of an opposing party." *Id*. Here, we find the merits of MPM-PPIA's and Appellants' the cross-motions for summary judgment are completely intertwined. The sole

18

question before the trial court was how the Liability Limit clause in the Policy should be interpreted and applied to the undisputed facts of this case. The facts material to each party's claim to judgment as a matter of law are the same. The only issue in each motion was whether the Policy provides for one Liability Limit or two. Therefore, our holding that the Policy provides for two Liability Limits establishes both that MPM-PPIA is not entitled to judgment as a matter of law and that Appellants are so entitled.

As claimants, Appellants are only entitled to summary judgment if they can establish there is no genuine dispute as to those material facts upon which they would have had the burden of persuasion at trial. *See Wilkes*, 92 S.W.3d at 120. As explained above, the undisputed facts in this case demonstrate Appellants' claims are subject to two Liability Limits under the terms of the Policy. Because this is the only issue in this entire proceeding, we find Appellants have demonstrated there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. *See id.* (affirming summary judgment in favor of plaintiffs against insurer on claim of equitable garnishment following agreement between plaintiffs and insured admitting liability and limiting damages to policy limit).

When disposing of a case on appeal, Rule 84.14 requires this Court to "give such judgment as the [trial] court ought to give" and "dispose finally of the case," unless "justice otherwise requires." *See Mathes v. Nolan*, 904 S.W.2d 353, 355 (Mo. App. E.D. 1995). Where, as here, our holding establishes the appellant is entitled to judgment as a matter of law, Rule 84.14 requires us to enter judgment in the Appellants' favor, without remanding the case to the trial court. *See Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 843 (Mo. App. W.D. 2011) (citing Rule 84.14 as authority for entering judgment in favor of appellant-plaintiff-insured, after finding the trial court erred in granting the respondent-defendant-insurer's motion

for summary judgment in a case involving the interpretation of an insurance policy). Justice does not require us to remand the case for further proceedings. No purpose would be served by additional proceedings because none of the material facts are in dispute as the parties settled all remaining issues. Accordingly, it is proper to enter judgment in favor of Appellants, pursuant to Rule 84.14.

CONCLUSION

The decision of the trial court granting MPM-PPIA's motion for summary judgment and denying Appellants' motion for summary judgment is reversed. The judgment in favor of MPM-PPIA is vacated, and judgment is hereby entered in favor of Appellants, pursuant to our authority in Rule 84.14.

_____
Angela T. Quigless, J.

Roy L. Richter, P.J., and
Robert M. Clayton III, J., concur.